635 F.2d 233
 2 Employee Benefits Ca 1891
 William A. MURPHY, Marvin Pease, William Rogers, Edward
Banachoski, Albert Betts, William Faherty, Albert Christman,
Roman Krysinski, Charles Manjerovic, Walter Regan, John
Austin, Jr., Frank Coniglio, Frank Kush, Lawrence Wiesen,
John Chmill and Sidney Robinson
v.
The HEPPENSTALL COMPANY, Appellant.
 Nos. 80-1690, 80-1724.
 United States Court of Appeals, Third Circuit.
 Argued Oct. 14, 1980.
Decided Dec. 10, 1980.
Rehearing and Rehearing In Banc Denied Jan. 9, 1981.
 
 Paul A. Manion (argued), William H. Powderly, III, Richard D. Brown, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for The Heppenstall Co.
 Daniel P. McIntyre (argued), Scott M. Spencer, Frank J. Lucchino, Steven L. Sablowsky, Pittsburgh, Pa., for appellees.
 Henry Rose, Gen. Counsel, Mitchell L. Strickler, Deputy Gen. Counsel, James N. Dulcan, Asst. Gen. Counsel, Stephen D. Schreiber, Trial Atty., Pension Benefit Guaranty Corp., Washington, D. C., for amicus curiae; Bernard Kleiman, Chicago, Ill., of counsel.
 Before GIBBONS and ROSENN, Circuit Judges, and HANNUM*, District Judge.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 Heppenstall Company (the employer) appeals from a grant of partial summary judgment in favor of sixteen retired Heppenstall employees (the employees). The employees sought directly from the employer the difference between the pension payments guaranteed by the Pension Benefit Guaranty Corporation (PBGC), and those provided in the pension agreement negotiated between the employer and the United Steel Workers of America (the Agreement). Finding nothing in the Employee Retirement Income Security Act (ERISA) 29 U.S.C. § 1001 et seq., to preempt contract claims against the employer for pension benefits in excess of those guaranteed by PBGC, we affirm.
 
 I. Facts and Proceedings Below
 
 2
 The underlying facts are the same as in Pension Benefit Guaranty Corp. v. Heppenstall Co., 633 F.2d 293, decided by this court July 30, 1980. In the present action, 16 retired employees brought their contract-based pension benefits claim to the district court two weeks before that court issued its order terminating the employees' pension plan. Invoking 29 U.S.C. § 1132(e) jurisdiction over actions to enforce rights under a pension plan, the employees argued the terms of the pension agreement obligated the employer itself, rather than a fund or an insurer, to pay pension benefits even after termination or expiration of the agreement.
 
 
 3
 The employer moved to dismiss, urging that the pension agreement did not make Heppenstall directly liable for pension benefits to its employees, that any claim for pension benefits must either be arbitrated, or be resolved in the proceeding terminating the pension plan, and that ERISA preempts contract claims against the employer for sums in excess of those guaranteed by the PBGC. The district court denied the motion to dismiss, and granted partial summary judgment for the employees, postponing the determination of amounts due the employees, but certifying that the summary judgment of liability was a controlling question which should be reviewed pursuant to 28 U.S.C. § 1292(b).[1]
 
 II. Discussion
 
 4
 The disputed portion of the Heppenstall-United Steel Workers' pension agreement provides:
 
 Section 10.2
 
 5
 Any benefit properly payable pursuant to this Agreement shall continue to be payable, notwithstanding the termination or expiration of this Agreement.
 
 
 6
 In the event that this Agreement is terminated, in whole or in part, the rights of any participant with respect to whom such termination shall have occurred shall, from the date of such termination or partial termination, be fully vested and nonforfeitable, subject to divestment by reason of death or operation of law, in the benefits established under the Agreement as of the date of such termination or partial termination is effective to the extent those benefits are funded by the Company in accordance with the provisions of Section 8 of this Agreement.
 
 Section 8.1 reads:
 
 7
 For the purpose of supplying the pension benefits herein provided, the Company may establish or cause to be established, a pension trust or trusts or may utilize any existing trust or trusts heretofore established by or on behalf of the Company. The Company is free to determine the manner and means of making provision for funding and paying the pension benefits set forth in this Agreement.
 
 
 8
 The employer asserts the second sentence of Section 10.2 limits its direct liability to its employees. This sentence, however, added to conform to Internal Revenue Service-ERISA statutory vesting and funding standards, simply determines when participants' rights shall have vested in the event of termination of the pension plan. The "is effective" clause, on which the employer relies to limit liability, has no syntactical correspondent. Even were the verb plural, it would still fail to modify the right to receive benefits. We read the collection of clauses to mean: on the date the agreement terminates, participants' rights to benefits under the Agreement vest fully, to the extent the Company has funded the benefits, as provided in Section 8.
 
 
 9
 Read this way, Section 10.2 might at first seem to take away what it gives: participants' rights vest "fully," but if the employer fails to fund a pension trust, participants have fully vested rights in scant benefits. In fact, however, the employees have rights to benefits under the Collective Bargaining Pension Agreement, not merely under a pension trust. Section 8.1 establishes that the employer may set up a pension trust, and fund it as he wills, but the provision does not confine the employer's liability for pension benefits to a pension trust. Section 8.1, then, does not oblige the employer to fund any trust; the employer could be directly liable for all pension payments due under the Agreement. Read together, Sections 8.1 and 10.2 thus confirm the employer's continuing direct liability for post-termination pension payments.[2]
 
 
 10
 The employer also relies on the pension Agreement's arbitration clause to maintain the employees may not bring their pension benefits claim in court. The arbitration clause, however, governs disputes concerning an employee-applicant's right to a pension, or the amount of a pension. This action does not address a dispute over these employees' rights under the pension agreement. The plaintiffs in this action are retired employees; their rights have already vested. This action instead concerns the enforceability of the Agreement's direct liability clause. If the clause is enforceable, the employees rights under it are clear.[3]
 
 
 11
 The employer's remaining arguments center on interpretation of several sections of ERISA. The employer maintains 29 U.S.C. § 1342(f) mandates the employee's pension benefits claim be adjudicated solely in the pension plan termination proceeding. Section 1342(f) states:
 
 
 12
 Exclusive Jurisdiction; stay of other proceedings:
 
 
 13
 (f) Upon the filing of an application for the appointment of a trustee or the issuance of a decree under this section, the court to which an application is made shall have exclusive jurisdiction of the plan involved and its property wherever located with the powers, to the extent consistent with the purposes of this section, of a court of bankruptcy and of a court in a proceeding under Chapter X of Title II. Pending an adjudication under subsection (c) of this section such court shall stay, and upon appointment by it of a trustee, as provided in this section such court shall continue the stay of, any pending bankruptcy, mortgage foreclosure, equity receivership, or other proceeding to reorganize, conserve, or liquidate the plan or its property and any other suit against any receiver, conservator, or trustee of the plan or its property. Pending such adjudication and upon the appointment by it of such trustee, the court may stay any proceeding to enforce a lien against property of the plan or any other suit against the plan.
 
 
 14
 By its own terms, Section 1342(f) does not apply to this action. The employees are not suing the pension plan. They are suing the employer for the difference between payments due under the pension plan, as guaranteed by the PBGC, and payments due directly from the employer under the collectively bargained pension Agreement. The sole defendant, and the sole source of the employees' recovery in this action is the employer.[4]
 
 
 15
 Finally, the employer asserts ERISA preempts contract claims for benefits in excess of those guaranteed by the PBGC. The employer's statutory argument is three-fold. The employer maintains 29 U.S.C. § 1144, ERISA's preemption section, limits employees' rights in pension benefits to those rights ERISA creates. The employer further argues that 29 U.S.C. §§ 1362 and 1322 place a cap on, respectively, the employer's liability for pension benefits, and the employees' right to receive employer-funded benefits. Neither the words of the statute, nor its legislative history warrant these conclusions.
 
 
 16
 29 U.S.C. § 1144 supercedes "state law relating to" a pension plan.[5] The employees' contract claim against the employer is not a state law claim. Rather, their claim arises under both the federal common law of labor-management contracts, and the federal common law of pension plans. Because the employees are seeking to enforce a provision of a collectively bargained pension agreement, federal common law applies. Textile Workers v. Lincoln Mills, 353 U.S. 448, 456-57, 77 S.Ct. 912, 917-18, 1 L.Ed.2d 972 (1957) (the broad jurisdictional grant of § 301(a) of the Taft-Hartley Act, 29 U.S.C. § 185(a) authorizes creation of federal common law of labor-management contracts); Sheeran v. General Electric Co., 593 F.2d 93, 96 (9th Cir. 1977) (individual employees may bring suit in federal court for breach of collective bargaining agreement).
 
 
 17
 Moreover, except for explicitly exempted plans, ERISA wholly regulates and federalizes the pension field. Section 1144 preempts any state law relating to ERISA-covered pension plans. Furthermore, like the Taft-Hartley Act grant of jurisdiction over labor-management contracts, ERISA in Section 1132(a) and (e) confers jurisdiction over actions concerning rights and benefits under a pension plan. In enacting ERISA, Congress authorized the evolution of a federal common law of pension plans. See ERISA Conference Report, remarks of Senator Javits: "It is also intended that a body of federal substantive law will be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans." III Leg. Hist. of the Employees Retirement Income Security Act of 1974, 4771; In Re C.D. Moyer Trust Fund, 441 F.Supp. 1128, 1131 (E.D.Pa.1977) ("under ERISA's legislative scheme, this court is empowered to formulate rules of law to govern various aspects of the employee benefit field," citing Sen. Javits' remarks), aff'd without opinion, 582 F.2d 1273 (3d Cir. 1978). Thus Section 1144 does not preempt direct employer liability under a pension agreement. We must therefore determine if that liability is inconsonant with some other facet of the statutory scheme.
 
 
 18
 The employer maintains the federally insured pension benefits set out in Title IV of ERISA, 29 U.S.C. §§ 1301-81, afford employees all the pension rights to which they are entitled. Any benefits in excess of the statutory provisions, it urges, would be inconsistent with the Congressional program of limiting employer liability for pension benefits. The employer misreads the plain wording of the statute, and misconstrues the legislative purpose motivating its enactment. Sections 1362 and 1322, which the employer invokes as expressions of Congressional intent to limit employer liability, in no way address pension benefits directly recoverable from the employer. Section 1362(b) does place a ceiling on employer liability for pension payments, but that liability is to the PBGC.[6] Similarly, Section 1322(a), (b)(1)(2)(3) limits the pension payments employees may recover from the PBGC.[7] Two lower federal courts have expressly held that the limitation in Section 1362 of employer liability to the PBGC does not limit the employer's direct contractual liability to its employees. In The Matter of M & M Transportation Company, 3 B.R. 722 (S.D.N.Y.1980), Pension and Profit Sharing (P-H) P 135,497 (5/30/80); In Re Alan Wood Steel Co., 5 B.R. 620 (Bkrtcy. E.D.Pa.1978), 212 BNA Pension Reporter D-1 (10/30/78).
 
 
 19
 In Nachman Corp. v. PBGC, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980), the Supreme Court reviewed Congress' concerns in enacting ERISA:
 
 
 20
 One of Congress' central purposes in enacting this complex legislation was to prevent the "great personal tragedy" suffered by employees whose vested benefits are not paid when pension plans are terminated. Congress found "that owing to the inadequacy of current minimum standards, the soundness and stability of plans with respect to adequate funds to pay promised benefits may be endangered; that owing to the termination of plans before requisite funds have been accumulated, employees and their beneficiaries have been deprived of anticipated benefits." ERISA § 2(a), 29 U.S.C. § 1001(a). Congress wanted to correct this condition by making sure that if a worker has been promised a defined pension benefit upon retirement-and if he has fulfilled whatever conditions are required to obtain a vested benefit-that he actually receive it. The termination insurance program is a major part of Congress' response to the problem. Congress provided for a minimum funding schedule and prescribed standards of conduct for plan administrators to make as certain as possible that pension fund assets would be adequate. But if a plan nonetheless terminates without sufficient assets to pay all vested benefits, the PBGC is required to pay them-within certain dollar limitations not applicable here-from funds established by that corporation. (footnotes omitted)
 
 
 21
 At 374, 100 S.Ct. at 1732. Under 29 U.S.C. § 1362(b), the PBGC can recover from the terminating employer up to 30% of its net worth in order to defray the costs of compensating retired employees.
 
 
 22
 The Nachman Court held that an employer's limitation of liability to sums within a pension fund did not eliminate the PBGC's guaranty of accrued, unfunded benefits. Had Nachman Corporation's interpretation prevailed, the PBGC would not have been obliged to pay pension claims, and thus could not have proceeded against Nachman for 30% of its net worth. The Court did not, however, rule that ERISA prohibited any disclaimer of direct liability. Rather, it maintained, the 30% reimbursement provision demonstrated Congress' intention to preserve employers' "right to place a contractual limit on their direct liability to their employees." At 385, 100 S.Ct. at 1738. If the employer may limit direct liability, direct liability must persist under ERISA. Otherwise Nachman would nonsensically permit restrictions on a form of liability the statute had precluded.
 
 
 23
 ERISA established "minimum standards" for pension payments due retired employees. Congress endeavored to guarantee retirees at least a portion of the payments a terminated pension plan would have afforded. It is not inconsistent with the statutory scheme to permit employees to recover directly from the employer any additional benefits to which the employer has contractually obligated itself. While the effect of permitting that additional recovery may reduce the employer's net worth, and thus decrease the amount the PBGC may recover from the employer, the PBGC in its amicus brief to this court has taken a position supporting the employees' right to recover directly from the employer. Because nothing in ERISA, nor in its legislative history, nor in the views expressed by the government corporation charged with administering ERISA-guaranteed pension payments discountenances direct contractual recovery of pension benefits from the employer, we will affirm the district court's grant of summary judgment of liability in favor of the employees.
 
 
 
 *
 Honorable John B. Hannum, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 In issuing the § 1292(b) order, the court ruled:
 said orders involve a controlling question of law as to which there is a substantial ground for difference of opinion and that an immediate appeal from said orders may materially advance the ultimate termination of the litigation, for if this Court's conclusion that the instant case is independent of the proceedings involving the Pension Benefit Guaranty Corporation is incorrect, and defendant's position is sustained that plaintiffs have no remedy except such as may be obtained in the proceedings at Nos. 79-2224 and 2225, the instant case would be immediately terminated without need to complete the calculations of the amounts payable to each employee entitled to pension benefits under the collectively bargained contract.
 On a Section 1292(b) appeal we consider all grounds which might require a reversal of the order appealed from. McCreary Tire & Rubber Co. v. CEAT S.p.A, 501 F.2d 1032 (3d Cir. 1974); Katz v. Carte Blanche Corp., 496 F.2d 747 (3d Cir.) (in banc), cert. denied, 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974); Johnson v. Alldredge, 448 F.2d 820 (3d Cir. 1973), cert. denied sub nom. Conrath v. Johnson, 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974).
 
 
 [2]
 In addition, Section 1.3 of the Agreement provides:
 Subject to the corporate actions required to provide the pension benefits and to the Company's obtaining and/or retaining (favorable tax treatment for the plan), the following pension benefits shall be provided by the Company or caused to be provided by the Company for the participants.
 The second sentence of Section 10.2 details one of the corporate actions requisite to retaining favorable tax treatment. Section 1.3 thus makes clear that the disputed sentence in Section 10.2 was never meant to divest retirees of their pension payments.
 
 
 [3]
 The arbitration clause provides:
 If any difference shall arise between the Company and any participant who shall be an applicant for a pension as to such participant's right to a pension or the amount of his pension and agreement cannot be reached between the Company and a representative of the International Union, such question shall be referred to an impartial umpire to be selected by the Company and the Union. The impartial umpire shall have authority only to decide the question pursuant to the provisions of this agreement applicable to the question-but he shall not have authority in any way to alter, add to or subtract from any of such provisions. The decision of the impartial umpire on any such question shall be binding on the Company, the Union and the participant.
 
 
 [4]
 The employer has argued the PBGC and the pension plan are indispensible parties to this action. On our reading of the pension Agreement and our disposition of the employer's argument under § 1342(f) it is unnecessary to join either the PBGC or the pension plan
 
 
 [5]
 29 U.S.C. § 1144 provides:
 § 1144 Other laws
 Supercedure; effective date
 (a) Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title. This section shall take effect on January 1, 1975.
 
 
 [6]
 Section 1362(b) reads:
 Amount of Liability
 (b) Any employer to which this section applies shall be liable to the corporation, in an amount equal to the lesser of-
 (1) the excess of-
 (A) the current value of the plan's benefits guaranteed under this subchapter on the date of termination over
 (B) the current value of the plan's assets allocable to such benefits on the date of termination, or
 (2) 30 percent of the net worth of the employer determined as of a day, chosen by the corporation but not more than 120 days prior to the date of termination, computed without regard to any liability under this section.
 
 
 [7]
 Section 1322(a) and (b)(1)(2)(3) read:
 Benefits guaranteed
 (a) Subject to the limitations contained in subsection (b) of this section, the corporation shall guarantee the payment of all nonforfeitable benefits (other than benefits becoming nonforfeitable solely on account of the termination of a plan) under the terms of a plan which terminates at a time when section 1321 of this title applies to it.
 (b)(1) Except to the extent provided in paragraph (8)-
 (A) no benefits provided by a plan which has been in effect for less than 60 months at the time the plan terminates shall be guaranteed under this section, and
 (B) any increase in the amount of benefits under a plan resulting from a plan amendment which was made, or became effective, whichever is later, within 60 months before the date on which the plan terminates shall be disregarded.
 (2) For purposes of this subsection, the time a successor plan (within the meaning of section 1321(a) of this title) has been in effect includes the time a previously established plan (within the meaning of section 1321(a) of this title) was in effect. For purposes of determining what benefits are guaranteed under this section in the case of a plan to which section 1321 of this title does not apply on September 3, 1974, the 60 month period referred to in paragraph (1) shall be computed beginning on the first date on which such section does apply to the plan.
 (3) The amount of monthly benefits described in subsection (a) of this section provided by a plan, which are guaranteed under this section with respect to a participant, shall not have an actuarial value which exceeds the actuarial value of a monthly benefit in the form of a life annuity commencing at age 65 equal to the lesser of-
 (A) his average monthly gross income from his employer during the 5 consecutive calendar year period (or, if less, during the number of calendar years in such period in which he actively participates in the plan) during which his gross income from that employer was greater than during any other such period with that employer determined by dividing 1/12 of the sum of all such gross income by the number of such calendar years in which he had such gross income, or
 (B) $750 multiplied by a fraction, the numerator of which is the contribution and benefit base (determined under section 430 of Title 42) in effect at the time the plan terminates and the denominator of which is such contribution and benefit base in effect in calendar year 1974.
 The provisions of this paragraph do not apply to non-basic benefits.