**UNITED STEELWORKERS OF AMERICA, AFL–CIO, CLC,**
Plaintiff,

v.

**UNITED ENGINEERING, INC., et al., Defendants.**

**No. 4:89CV0137.**

United States District Court,
N.D. Ohio, E.D.

Nov. 23, 1993.

Todd C. Park, Mark A. Rock, Schwarzwald & Rock, Cleveland, OH, for plaintiff.

Michael James Ranallo, Keith L. Pryatel, Millisor & Nobil, Cleveland, OH, Joseph M. Gagliardo, Laner, Muchin, Dombrow, Becker, Levin & Tominberg, Chicago, IL, for United Engineering, Inc.

Arthur I. Harris, Office of the U.S. Atty., Cleveland, OH, James J. Armbruster, David J. Gzesh, Valerie R. Dinkins, Office of the Gen. Counsel, Carol Connor Flowe, Jeffrey B. Cohen, Pension Ben. Guar. Corp., Office of the Gen. Counsel, Washington, DC, for Pension Ben. Guar. Corp.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

The United Steelworkers of America, AFL–CIO ("USWA") brings this action for the payment of supplemental pension benefits against United Engineering, Inc. and several related corporate entities (collectively, "United"), and the Pension Benefit Guarantee Corporation ("PBGC"), under section 301 of the Labor–Management Relations Act ("LMRA"), 29 U.S.C. § 185; and sections 502, 404, and 409 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), § 1104, § 1109.

Defendants United and PBGC moved for summary judgment,[1] claiming any cause of action by employees against the employer for supplemental benefits is preempted by ERISA.

For the reasons stated below, this Court grants United's and PBGC's motions for summary judgment on all claims against both defendants.

---

1. Although United moved for summary judgment on Counts I–III, Count IV does not apply to United. Both motions can thus be treated as motions for summary judgment on all counts.

## I.

The material facts for the purposes of this motion are not in dispute. The United Steelworkers of America ("USWA") and Wean United, Inc., were for several years parties to a series of collective bargaining agreements. With the exception of PBGC, all the defendants in this case are corporate entities who are successors to Wean United. These corporate entities, collectively, "United," agreed to assume the pension obligations of Wean. One of these obligations was "Plan 007," the pension plan at issue in this case.

The PBGC is a wholly-owned U.S. government corporation created under Title IV of ERISA, see 29 U.S.C. § 1302, to administer the single-employer pension plan termination insurance program established by Title IV. If a covered pension plan terminates without sufficient funds to pay all its obligations, PBGC makes up the difference for all obligations which ERISA defines as "guaranteed" benefits, using funds from PBGC's trust funds. To meet the obligations, PBGC uses assets of the terminated plan; monies from the former plan sponsor, often the employer, 29 U.S.C. §§ 1362, 1368; and annual premiums paid by all covered plans, 29 U.S.C. §§ 1306, 1307.

In 1988, United employees brought suit to prevent the termination of Plan 007 and to recover supplemental pension benefits which United had not paid out since United filed a Notice of Termination with the PBGC. That case and a related class action, *Humble v. United Eng'g, et al.,* No. C88–4236–Y, was settled in 1990. The court approved a plan termination date as of August 14, 1989. Under the terms of the agreement, employees retained all rights to sue for certain non-guaranteed supplemental pension benefits accrued prior to plan termination.

In May, 1992, United and PBGC entered an Employer Liability Settlement Agreement ("ELSA"), which settles the obligations of United to the PBGC for all unfunded benefit liabilities. USWA claims that the agreed-upon settlement will provide no monies for payment of the supplemental benefits, which are non-guaranteed liabilities. USWA thus brings this action directly against the employer for recovery of non-guaranteed benefits.

PBGC and United moved for summary judgment on the ground that such a direct action against the employer for non-guaranteed benefits, after plan termination, is preempted by the provisions of ERISA.

## II.

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law ...

The nature of materials properly presented in a summary judgment pleading is set forth in Federal Rule of Civil Procedure 56(e):

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein ... The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to inter-

rogatories, and admissions on file. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ In reviewing summary judgment motions, this Court must view the evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Assn., Inc.,* 909 F.2d 941, 943–44 (6th Cir.1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. at 2512.

### III.

*A. ERISA Termination Provisions.*

Several provisions of ERISA specifically govern the liability of employers, and the role of the PBGC, in the event a single-employer ERISA pension plan is terminated without sufficient funds to pay pension benefit obligations. In the event of a termination, the PBGC guarantees the payment of certain pension benefits, "unfunded guaranteed benefits," making up any deficiencies in the employer's funds from the PBGC Title IV trust funds. 29 U.S.C. §§ 1305, 1321, 1322, 1341, 1342, 1361.

Since 1986, ERISA has *also* made employers liable to PBGC for pension obligations which are in excess of those guaranteed by PBGC, so called "unfunded non-guaranteed benefits." *See* 29 U.S.C. § 1362(b)(1)(A). Accordingly, employers such as United are liable to PBGC for "the total amount of the unfunded benefit liabilities" to all participants and beneficiaries. *Id.* PBGC is obli-

gated to allocate the recovered funds between "guaranteed" and "non-guaranteed" liabilities, according to a "recovery ratio" described in § 1322(c), and allocate the "non-guaranteed" funds among plan participants and beneficiaries according to a priority scheme set out in 29 U.S.C. § 1344(a).

■ In its motion for summary judgment, PBGC raises a single claim:[2] that the current version of ERISA preempts a direct action by USWA against United for recovery of supplemental benefits, which are "unfunded non-guaranteed benefits." USWA acknowledges that § 1362(b)(1)(A) *entitles* PBGC to collect all liabilities from the employer, but USWA denies that PBGC's right to collect *precludes* employees themselves from bringing their own action.

USWA cites in support of its position *Murphy v. Heppenstall Co.,* 635 F.2d 233 (3d Cir.1980), *cert. denied* 454 U.S. 1142, 102 S.Ct. 999, 71 L.Ed.2d 293 (1982). In *Heppenstall,* employees sought to recover nonguaranteed benefits directly from their employer. The PBGC *supported* the *Heppenstall* employees' position in an *amicus curiae* brief. At the time, § 1362 of ERISA made employers liable to the PBGC only for guaranteed liabilities. The employer claimed that any benefits in excess of those provided for in the ERISA/PBGC scheme were inconsistent with ERISA, and should be disallowed.

The *Heppenstall* court found for the plaintiff employees, holding that while ERISA limited employer liability *to the PBGC,* § 1362 "does not limit the employer's direct contractual liability to its employees." 635 F.2d at 237–38. Several Sixth Circuit cases after *Heppenstall* applied its analysis, and allowed employees to bring actions for nonguaranteed benefits directly against the employer. *E.g., Haytcher v. ABS Indus., Inc.,* 889 F.2d 64 (6th Cir.1989) (nothing in ERISA allows employer to ignore contractual obligations for supplemental benefits); *United Steel Workers v. North Bend Terminal,* 752 F.2d 256, 259 (6th Cir.1985) (fulfilling ERISA obligation does not exempt employer from

**2.** United has incorporated PBGC's memoranda into United's motion by reference; thus the two

motions can be decided together.

employee action for additional benefits); *Grimes v. Dayton–Walther Corp.,* 680 F.Supp. 1110 (S.D.Ohio 1987).

Each of the plans in these cases, however, was terminated before the enactment of the Single Employer Pension Plan Amendments Act ("SEPPAA") in 1986, and the Pension Protection Act ("PPA") in 1987.[3] SEPPAA set up a trust fund, the "section 4049 trust," to receive from employers, and distribute to plan participants, amounts to cover non-guaranteed benefits. *See* 29 U.S.C. § 1349 (repealed). Thus as of 1986, ERISA addressed for the first time protection for beneficiaries of non-guaranteed benefits.

In 1987, Congress eliminated the interim solution of the section 4049 trust, when it enacted the PPA. The conference committee report accompanying the PPA notes that the PPA

> repeals the termination trust mechanism for payment of benefits above guaranteed levels. Instead, under the conference agreement, the total amount of the employer's liability is paid to the PBGC. The PBGC pays out a portion of unfunded benefit liabilities in excess of unfunded guaranteed benefits based on the total value of the PBGC's recovery with respect to the total liability of the employer.

H.R.Conf.Rep. No. 495, 100th Cong., 1st Sess. at 884 (1987). U.S.Code Cong. & Admin.News pp. 2313–1, 2313–1245, 2313–1630. After the PPA, ERISA now provides that plan sponsors (usually the employer) "shall" be liable to PBGC for all of its unfunded liabilities, 29 U.S.C. § 1362(b)(1)(A); PBGC "shall" pay participants and beneficiaries by allocating funds to guaranteed and non-guaranteed liabilities, *id.* § 1322(c); and the plan administrator "shall" allocate assets among participants and beneficiaries according to particular priorities, *id.* § 1344(a).

The Sixth Circuit has not addressed the relative rights of PBGC and employees since the enactment of SEPPAA or the PPA. Moreover, this Court has found no law from other Circuits discussing the effect of the

1986 or 1987 amendments on employee contractual rights. However, this Court finds persuasive the analysis of the district court for the Western District of Oklahoma, which considered in 1991 claims of employees and the PBGC in the context of the employer's *bankruptcy.*

In *In re Adams Hard Facing,* 129 B.R. 662 (W.D.Okla.1991), the court disallowed direct claims of pension plan participants for non-guaranteed benefits. The court noted that after the PPA, ERISA entitles PBGC to collect all unfunded liabilities, and requires PBGC to allocate all funds according to the provisions of § 1322(c) and the priorities of § 1344(a). The court noted the employer's and PBGC's position that if employees were permitted to claim benefits directly, "the purposes of ERISA § 4044(a) [§ 1344(a) ] will be defeated." *Id.* Accordingly, the *Adams* court instructed PBGC to collect all liabilities and allocate the funds in strict compliance with ERISA. Because the employee claims were inconsistent with the PPA scheme, they were disallowed.

This Court similarly finds that allowing direct recoveries by employees would defeat the pension plan termination framework set out in ERISA. If individual employees could sue the employer directly for non-guaranteed benefits, the priority scheme set out in ERISA for payment of claims by the PBGC would be rendered meaningless. In the case of severely underfunded employers, those employees at the front of the litigation line would receive 100% of their benefits, while others would be left with nothing. USWA argues that the alternative system is unduly harsh, because beneficiaries of supplemental benefits will receive only a tiny portion of their benefits after guaranteed benefits are covered. However, the priority scheme permitting such a result was set up by Congress in § 1322(c) and § 1344(a); this Court will not second-guess Congress's decision to provide primarily for reimbursement of PBGC

---

**3.** USWA maintains that SEPPAA is irrelevant to the issue in this case, since SEPPAA was repealed by PPA in 1987. This Court disagrees.

SEPPAA represents an interim amendment to ERISA, and indicates the direction Congress was taking in amending ERISA in the mid–1980s.

before distribution to non-guaranteed participants.[4]

USWA argues that neither the language of the PPA itself, nor the legislative history of the statute, expressly eliminate the substantive federal rights of employees to sue under § 301 of the LMRA for collective bargaining agreement violations. However, precluding a direct action against the employer after termination of the pension plan does not "eliminate" the § 301 right, but simply prevents employees from personally asserting the right in one context, after plan termination. Employees can still bring § 301 actions to address complaints about ongoing pension plans. Just as the *Heppenstall* court saw its decision *allowing* a § 301 direct action under the collective bargaining agreement as one of "federal common law," 635 F.2d at 237, this Court finds a decision *restricting* a § 301 claim in that context, a restriction of that federal common law in the face of a new statute.

### B. Due Process Concerns.

■ In its Memorandum in Opposition to the motions for summary judgment, USWA claims that adopting PBGC's interpretation of ERISA in light of the PPA would amount to a deprivation of a property interest without due process. Specifically, USWA claims that PBGC disposed of the employer's liability in the ELSA, and thus eliminated the beneficiaries' property interest, without any hearing or participation by beneficiaries in the negotiation process.

Assuming *arguendo* that the negotiation process employed by PBGC with plan sponsors deprives beneficiaries of a property interest, this Court finds that the process does not amount to a due process violation.

In challenging the constitutionality of economic legislation as a violation of due process or equal protection, a plaintiff must overcome a heavy burden. The United States Supreme Court has held that

> legislative Acts adjusting the burdens and benefits of economic life come to this Court with a presumption of constitutionality, and that the burden is on one complaining of due process violation to establish that the legislature has acted in an arbitrary and irrational way.

*Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 729, 104 S.Ct. 2709, 2717–18, 81 L.Ed.2d 601 (1985) (citing *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976)).

Under the deferential "rational basis" standard set out in *Gray,* this Court finds that neither the PBGC negotiating process, nor the ERISA amendment itself, is "arbitrary and irrational." While PBGC does have the sole authority to negotiate with employers to determine liability amounts, PBGC itself has a great interest in recovering a large sum from employers, as such sums are one of the primary sources of funding for PBGC's guaranteed payments. Once unfunded liabilities are recovered, PBGC is bound by the priority and allocation scheme in ERISA; PBGC does not have the ability to "negotiate away" contractual, nonguaranteed benefits, as USWA argues.

Moreover, this Court questions USWA's conclusion that additional procedural safeguards would only minimally burden PBGC. PBGC provides pension insurance to approximately forty million Americans, covered under 85,000 defined benefit plans. James B. Lockhart, *Securing the Pension Promise,* 443 Lab.L.J. 195, 195 (1992). Requiring PBGC to hold hearings involving employees each time PBGC conducted termination proceedings could very likely constitute a substantial burden on PBGC.

---

4. Moreover, this Court notes that allowing individual employees to jump ahead of the PBGC would impose some costs on the pension insurance system itself. If the employer pays 100% of non-guaranteed benefits directly to employees, PBGC potentially loses significant reimbursement for its own payments to cover *guaranteed* benefits. "Recent estimates have put the PBGC's negative net worth in the range of $2.5 billion, with predictions that absent remedial legislation it will reach $18 billion before the turn of the century." Daniel Keating, *Chapter 11's New Ten–Ton Monster: The PBGC and Bankruptcy,* 77 Minn.L.Rev. 803 (1993). Given this financial reality, this Court cannot conclude that preempting direct employee recovery in favor of the priority scheme is an irrational approach by Congress.

Finally, binding PBGC to the allocation and distribution schemes in ERISA ensures a rational distribution of available assets to plan beneficiaries. The fact that particular supplemental beneficiaries will undoubtedly receive less under the ERISA–PBGC scheme, than if they could proceed individually against the employer for the full amount of their benefits, does not turn the ERISA scheme into a deprivation of due process. Because this Court finds that allowing PBGC to negotiate directly with plan sponsors upon plan termination is not arbitrary or irrational, and because the distribution of assets provided for in ERISA is itself rational, this Court finds that the negotiating process employed by PBGC comports with the due process requirements of the fifth amendment.

### IV.

The *Heppenstall* court's decision allowing § 301 claims *after* termination of the pension plan was premised on its observation that "[i]t is not inconsistent with the statutory scheme to permit employees to recover directly...." *Id.* at 239. This Court finds that in light of the 1987 amendments to ERISA, such direct recovery *is* inconsistent with the statutory scheme of ERISA governing plan terminations. Accordingly, this Court finds that ERISA precludes direct suits by plan beneficiaries for the recovery of non-guaranteed pension benefits.

This Court thus grants United's and PBGC's motions for summary judgment. Judgment is hereby entered for the defendants. This order is final and appealable.

IT IS SO ORDERED.