**Larry B. RICKE, Trustee of Trust Established Pursuant to Section 4049 of the Employee Retirement Income Security Act of 1974, Plaintiff,**

v.

**ARMCO, INC., Defendant.**

No. 3–94 CIV 927.

United States District Court,
D. Minnesota,
Third Division.

March 28, 1995.

Briggs & Morgan, by Samuel L. Hanson and Marian Durkin, Minneapolis, MN, appeared on behalf of plaintiff.

Dorsey & Whitney, by David A. Ranheim and Paul R. Dieseth, Minneapolis, MN, appeared on behalf of defendant.

Kartar Khalsa, Washington, DC, appeared on behalf of the Pension Benefit Guar. Corp. amicus curiae.

Fryberger, Buchanan, Smith & Frederick, by Joseph J. Mihalek, Duluth, MN, appeared on behalf of plaintiffs in a related case, Warner v. Armco, No. 5–92 CIV 120.

### ORDER

ALSOP, Senior District Judge.

This matter comes before the Court on the defendant's motion for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.

## I. BACKGROUND

The plaintiff in this action is a trustee appointed by the Pension Benefit Guaranty Corporation (the "PBGC") under section 4049 of ERISA. 29 U.S.C. § 1349(b) (ERISA § 4049(b)). Ricke asserts claims against Armco, Inc. ("Armco") on behalf of former Reserve Mining Company hourly employees, seeking payment of unfunded pension benefits not guaranteed by the PBGC. The employees were members of the United Steelworkers of America ("the Union").

Reserve Mining Company ("Reserve") owned and operated taconite mining and processing facilities in northern Minnesota. Reserve shipped the processed taconite to steel mills operated by Reserve's parent companies, Republic Steel Corporation ("Republic") and Armco. Republic and Armco originally operated Reserve as a "cost company," paying Reserve's operating expenses as incurred and causing Reserve to have no net earnings. For tax purposes, Reserve was eventually reorganized from a corporation into a partnership. One of Reserve's partners, First Taconite Company ("First Taconite") was a wholly-owned subsidiary of Armco.

In August 1986, Reserve and First Taconite filed petitions under Chapter 11 of the Bankruptcy Code. Reserve's bankruptcy terminated its unfunded welfare and pension benefit plans. On the effective termination date of the employees' pension plan, May 24, 1987, the benefit commitments that had vested under the plan were estimated to have a value of approximately $87 million dollars, leaving the plan underfunded by $33 million dollars.

On July 15, 1988, the Union filed suit against Armco on behalf of all of its members who were or had been employed at Reserve. See United Steelworkers of America v. Armco, Inc., No. 4–88 CIV 599. The Union's lawsuit asserted various corporate-veil piercing theories and alleged that Armco was liable under the Union's collective bargaining and pension agreements with Reserve. In 1991, the Union's lawsuit was settled pursu-

ant to a written settlement agreement. Under the terms of the agreement, individual members of the Union could decline to participate in the settlement and, instead, pursue their own claims against Armco. The PBGC did not participate in the *United Steelworkers* action.

The former *hourly* employees declining to participate in the *United Steelworkers* settlement filed suit against *Armco* on July 24, 1992 to enforce the terms of Reserve's collective bargaining agreement with the Union and to recover benefits they allege are due to them under the various Reserve employee benefit plans that were incorporated in the agreement. *See Warner v. Armco, Inc.*, No. 5–92 CIV 120. This Court dismissed the plaintiffs' ERISA and common law claims in the *Warner* action. *See Warner v. Armco, Inc.*, No. 5–92 CIV 120 (D.Minn. Feb. 16, 1993); *Warner v. Armco, Inc.*, No. 5–92 CIV 120 (D.Minn. Oct. 22, 1993). The only claims remaining in *Warner* are the labor law claims based on the collective bargaining agreement (claims for pension plan benefits and welfare benefits).

In a related case, former *salaried* employees and retirees of Reserve who had participated in Reserve's underfunded plans filed suit against Armco. *See Adamson v. Armco*, No. 5–92 CIV 114. This Court dismissed the plaintiffs' ERISA and common law claims in the *Adamson* action for the same reasons that it dismissed the plaintiffs' ERISA claims in *Warner*, generally because they were time-barred or for lack of standing. *See Adamson v. Armco, Inc.*, No. 5–92 CIV 114 (D.Minn. Feb. 16, 1993); *Adamson v. Armco, Inc.*, No. 5–92 CIV 114 (D.Minn. Oct. 22, 1993). Unlike *Warner*, *Adamson* was completely dismissed as a result of the October 22, 1993 Order. The plaintiff appealed, and this Court's Order was affirmed by the Eighth Circuit Court of Appeals on January 5, 1995. *See Adamson v. Armco*, 44 F.3d 650 (8th Cir.1995).

On April 7, 1994, the PBGC became involved in these proceedings for the first time, when it commenced an action against Armco to recover the unfunded, *guaranteed* benefits. On April 18, 1994, the PBGC appointed Larry B. Ricke as the Section 4049 Trustee,

and on April 25, 1994, Ricke commenced the instant action against Armco for the unfunded, *non-guaranteed* pension benefits. While the instant action was pending, Armco reached a settlement with the PBGC on June 30, 1994 in the action for *guaranteed* benefits. The settlement provided for the payment of $10 million for the unfunded, guaranteed benefits.

## II. *SUMMARY JUDGMENT*

Summary judgment is proper if examination of the evidence in a light most favorable to the non-moving party reveals no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). This action is suitable for resolution by summary judgment because the issue presented is purely one of law.

## III. *DISCUSSION*

■ The parties agree that this action is governed by the Single–Employer Pension Plan Amendments Act of 1986 ("SEPPAA"), which is a collection of ERISA amendments. To qualify for distress termination under SEPPAA, the employer must "satisfactorily demonstrate that if it is required to continue to fund the pension plan, it will collapse, thereby causing not only the termination of the pension plan but also the termination of the business and loss of employment to the participants." *International Ass'n of Machinists and Aerospace Workers v. Rome Cable Corp.*, 810 F.Supp. 402, 406 (N.D.N.Y. 1993) (citing 29 U.S.C. § 1341(c)(2)(B)(iii) (SEPPAA § 4041(c)(2)(B)(iii))). This scheme "is intended to ensure the benefits of the pension plan to the participants and beneficiaries and possibly to salvage the employer's business, thereby safeguarding the employment of the participants." *Id.* (citations omitted).

Several provisions of ERISA specifically govern the liability of employers, and the role of the PBGC, where an ERISA pension plan is terminated without sufficient funds to pay pension benefit obligations, such as in a distress termination situation. *United Steelworkers of America v. United Engineering,*

*Inc.*, 839 F.Supp. 1279, 1282 (N.D.Ohio 1993). Upon termination, the PBGC guarantees the payment of "unfunded *guaranteed* benefits," thereby making up any deficiencies in the employer's funds from the PBGC Title IV trust funds.[1]  *Id.*

With the passage of SEPPAA on April 7, 1986, ERISA also "addressed for the first time protection for beneficiaries of *non-guaranteed* benefits." *United Engineering*, 839 F.Supp. at 1283 (emphasis added). SEPPAA set up a trust fund, the "section 4049 trust" mechanism, to receive from employers, and distribute to plan participants, amounts to cover non-guaranteed benefits. *Id.;* 29 U.S.C. § 1362(c) (ERISA § 4062(c)). Liability under SEPPAA was limited to the lesser of 75% of the unfunded non-guaranteed benefits, or 15% of the total unfunded pension benefits (both guaranteed and non-guaranteed). 29 U.S.C. § 1362(c) (ERISA § 4062(c)).

In 1987, Congress eliminated the interim solution of the section 4049 trust mechanism with the enactment of the Pension Protection Act of 1987 ("PPA"). The PPA substituted the section 4049 trust with a requirement that the PBGC itself pursue third parties for the recovery of both guaranteed and non-guaranteed benefits. 29 U.S.C. § 1362(b)(1) (ERISA § 4062(b)(1)). Amounts obtained from third parties are split between the PBGC (to compensate the PBGC for funding guaranteed benefits) and participants entitled to non-guaranteed benefits. 29 U.S.C. § 1322(c) (ERISA § 4022(c)). Under the PPA, the PBGC is entitled to seek recovery of 100% of the non-guaranteed pension benefits.

The central issue before the Court is whether individuals may bring an action under SEPPAA for unfunded *non-guaranteed* pension benefits, or if only the Section 4049 Trustee may bring such an action. As previously noted, this action is governed by SEPPAA, the short-lived ERISA amendment that existed before the PPA was enacted. Armco argues that individuals, in addition to the Section 4049 Trustee, may maintain actions for unfunded non-guaranteed pension benefits under SEPPAA. Armco contends that it is entitled to summary judgment because the Section 4049 Trustee's claims are barred by the releases signed by the settling former reserve employees in *United Steelworkers*, and because the Trustee's claims mirror the claims brought by the non-settling former reserve employees in *Warner*. The PBGC and Ricke argue that only the Section 4049 Trustee may maintain an action for unfunded non-guaranteed pension benefits under SEPPAA, and that the releases signed in connection with the settlement of *United Steelworkers* are, therefore, invalid.

As ERISA has evolved, an individual's right to sue for unfunded *non-guaranteed* pension benefits has gone through a series of transformations. Before the passage of SEPPAA, courts had determined that individuals could bring actions for such benefits. *See Murphy v. Heppenstall Co.*, 635 F.2d 233, 233 (3d Cir.1980), *cert. denied*, 454 U.S. 1142, 102 S.Ct. 999, 71 L.Ed.2d 293 (1982) (holding that "[i]t is not inconsistent with the statutory scheme to permit employees to recover directly from the employer [non-guaranteed] pension benefits …"); *accord United Steelworkers of Am. v. North Bend Terminal Co.*, 752 F.2d 256, 259 (6th Cir.1985); *Grimes v. Dayton–Walther Corp.*, 680 F.Supp. 1110, 1117 (S.D.Ohio 1987); *In re M & M Trans. Co.*, 3 B.R. 722, 727 (S.D.N.Y.1980). Under the PPA, it is fairly settled that direct participant actions for unfunded non-guaranteed benefits are no longer permissible. *See United Engineering*, 839 F.Supp. at 1283 (holding that under the PPA, "allowing direct recoveries by employees would defeat the pension plan termination framework set out in ERISA"); *accord In re Adams Hard Facing Co.*, 129 B.R. 662 (W.D.Okla.1991). The question here, therefore, is whether Congress intended to change the rule set forth by the *Heppenstall* line of cases with SEPPAA, or if it was not effectively changed until the PPA was enacted in 1987.

---

1.  Before SEPPAA, pension plan participants were not afforded statutory protection against loss of non-guaranteed pension benefits. Courts, however, allowed participants to bring individual actions for such benefits. *See Murphy v. Heppenstall Co.*, 635 F.2d 233, 239 (3d Cir.1980), *cert. denied*, 454 U.S. 1142, 102 S.Ct. 999, 71 L.Ed.2d 293 (1982).

Very few courts have addressed the central issue in this case, but several decisions lend guidance.[2] In *Rome Cable*, 810 F.Supp. at 402, the Court considered whether individuals could recover against their employers for unfunded *guaranteed*, as opposed to *non-guaranteed*, pension benefits under SEPPAA. In disallowing recovery, the Court concluded that a different result would conflict with SEPPAA's distribution scheme and its goal of ensuring the employer's continued operation and employment of plan participants. *Id.* at 407. The Court stated that "[i]t would be counterproductive indeed to find that the employer would, following a distress termination, be liable not only to the PBGC but also remain liable to the plan participants and beneficiaries."[3] *Id.* Although *Rome Cable* involved guaranteed benefits, the Court nonetheless finds its rationale persuasive here.

Ricke and the PBGC also rely upon *United Engineering*, 839 F.Supp. at 1279. *United Engineering* involved an action under the PPA, as opposed to SEPPAA, for unfunded non-guaranteed pension benefits. The Court disallowed recovery, reasoning as follows:

> If individual employees could sue the employer directly for non-guaranteed benefits, the priority scheme set out in ERISA for payment of claims by the PBGC would be rendered meaningless. In the case of severely underfunded employers, those employees at the front of the litigation line would receive 100% of their benefits, while others would be left with nothing.

*Id.* at 1283. Armco argues that *United Engineering* is inapplicable because SEPPAA did not set forth the complex type of allocation scheme established by the PPA. While the allocation schemes mandated by SEPPAA and the PPA clearly differ, the result of allowing participant actions would be the same. SEPPAA requires that the Section 4049 Trustee pay all beneficiaries rateably, based upon the total amount of benefits due compared to the funds available. This distribution system would be undermined if employees quick to sue were allowed to recover some or all of their benefits, while others received little or nothing.[4] *See In re Adams Hard Facing*, 129 B.R. at 662.

Armco argues that participant actions, pursuant to the *Heppenstall* line of cases, were statutorily based on ERISA § 502, 29 U.S.C. § 1132, and LMRA § 301, 29 U.S.C. § 185, and that because SEPPAA contained no provision purporting to limit an individual's right to sue under §§ 502 and 301, a determination that individual actions are barred under SEPPAA would be contrary to the doctrine of implied repeal. The PBGC and Ricke argue that the individual's right to sue prior to SEPPAA was based on federal common law, and that SEPPAA and the PPA replaced the previously recognized common law right of action by employees, thereby providing the exclusive remedy for enforcing the employer's liability.

■ While the relevant federal common law is, in fact, derived from the statutory

---

**2.** Armco cites *In re Chateaugay Corp.*, 87 B.R. 779 (S.D.N.Y.1988), *aff'd, PBGC v. LTV Corp.*, 875 F.2d 1008 (2d Cir.1989), *rev'd, Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990), in support of its position that individual actions are permissible under SEPPAA. The Court finds that *In re Chateaugay*, 87 B.R. 779, in which the Court allowed the beneficiaries' right to sue for unfunded non-guaranteed pension benefits under SEPPAA, is distinguishable from the facts of the instant case. Unlike this action, *In re Chateaugay* involved "defined benefit pension plans, not relating to pension benefits in a distress termination of a retirement plan." *Rome Cable*, 810 F.Supp. at 406 n. 1. In addition, because no Section 4049 Trustee had been appointed, the Court did not have occasion to squarely address the issue currently before this Court.

**3.** In addition, the Court noted that "it is the responsibility of the Section 4049 Trustee to attempt to recoup [non-guaranteed] benefits from the plan sponsor." *Id.* 810 F.Supp. at 405.

**4.** Armco argues that disallowing individual participant actions would be inequitable because the Section 4049 Trustee can only recover 75% of unfunded benefits under SEPPAA, leaving the individuals without a mechanism by which to recover 100% of their non-guaranteed benefits. Armco also contends that such a decision would leave individual participants "dependent upon the PBGC for the appointment of a section 4049 trustee." (Def. Reply Mem. at 18). As the Court noted in *United Engineering*, 839 F.Supp. at 1283, "the priority scheme permitting such a result was set up by Congress.... this Court will not second-guess Congress's decision."

sections cited by Armco, federal common law *defines* the scope of an individual's right to sue pursuant to §§ 301 and 502. As the Court in *United Engineering,* 839 F.Supp. at 1284, explained:

> [P]recluding a direct action against the employer after termination of the pension plan does not 'eliminate' the § 301 right, but simply prevents employees from personally asserting the right in one context, after plan termination. Employees can still bring § 301 actions to address complaints about ongoing pension plans. Just as the *Heppenstall* court saw its decision *allowing* a § 301 direct action under the collective bargaining agreement as one of 'federal common law,' 635 F.2d at 237, this Court finds a decision *restricting* a § 301 claim in that context, a restriction of that federal common law in the face of a new statute.

*Id.* 839 F.Supp. at 1284. While *United Engineering* addressed the PPA, as opposed to SEPPAA, the Court finds the reasoning equally applicable to this SEPPAA action. Just as the *United Engineering* Court saw its decision as a restriction of federal common law, this Court finds that a decision restricting § 301 and § 502 claims is a "restriction of ... federal common law in the face of a new statute [SEPPAA.]" *Id.* Because an individual's right to sue prior to SEPPAA's enactment was based on federal common law, a determination that SEPPAA eliminated that right is not contrary to the doctrine of implied repeal. For the reasons already stated, the Court finds that Congress intended to limit direct participant actions with SEPPAA.

▪ Having determined that plan participants may not sue for non-guaranteed pension benefits under SEPPAA, the Court finds that the releases signed by individuals in the *United Steelworkers* case do not affect the Section 4049 Trustee's right to bring this action. In general, "a statutory right conferred on a private party, but affecting the public interest, may not be waived or released if such waiver or release contravenes the statutory policy." *Brooklyn Sav. Bank v. O'Neil,* 324 U.S. 697, 704, 65 S.Ct. 895, 900, 89 L.Ed. 1296 (1945). Allowing individuals to

waive the rights guaranteed by SEPPAA would contravene ERISA's purpose. *See Allen v. American Home Foods, Inc.,* 644 F.Supp. 1553, 1563 (N.D.Ind.1986).

Accordingly, upon review of the files, motions, and proceedings herein,

**IT IS ORDERED** That the Motion of Armco, Inc. for Summary Judgment is **DENIED.**