David **HAYTCHER**, et al.,
Plaintiffs–Appellants,

v.

**ABS INDUSTRIES, INC.**, et al.,
Defendants–Appellees.

No. 88–3788.

United States Court of Appeals,
Sixth Circuit.

Argued June 15, 1989.

Decided Nov. 1, 1989.

Rehearing Denied Nov. 28, 1989.

Melvin S. Schwarzwald (argued), Kathleen M. Kordeleski, Schwarzwald, Robiner, Levin & Rock, Cleveland, Ohio; William T. Payne, United Steelworkers of America, Pittsburgh, Pa., for plaintiffs-appellants.

Paul J. Corrado, Cleveland, Ohio; Gregory L. Hammond (argued), Hammond & Associates, Akron, Ohio, for defendants-appellees.

Before KEITH and WELLFORD, Circuit Judges, and GILMORE, District Judge.[*]

KEITH, Circuit Judge.

Plaintiffs, six retired or otherwise former employees of defendants Ashtabula Forge, a division of ABS Industries, Inc. (hereinafter collectively referred to as "ABS"), appeal the granting of summary judgment for defendants in this action filed pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and §§ 409 and 502 of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109 and 1132. Plaintiffs alleged: first, that they are entitled to a two-year accumulation of benefits (the "creep-in") under the pension plan because of a plan provision that lay-offs of less than two years shall not constitute a break in continuous service; and second, that a

---

[*] The Honorable Horace W. Gilmore, U.S. District Judge for the Eastern District of Michigan, sitting by designation.

separate obligation exists on the part of ABS to pay a $105.00 per month retirement supplement. For the reasons which follow, we affirm the denial of the two-year "creep-in", but reverse and remand for the award of the retirement supplement.

## I.

On October 22, 1982, ABS gave the following notice to all employees at the Ashtabula Forge plant:

To: All Employees of Ashtabula Forge, Inc.

From: Robert C. Cook

Re: Permanent shut down of Ashtabula Forge, Inc.

Ashtabula Forge, Inc., will permanently cease all production effective as of the end of the regularly scheduled shift on Friday, October 29, 1982. All bargaining unit employees will be permanently laid off at that time.

At the time of the 1982 shut down, the 1981–1984 collective bargaining agreement was in effect. Section 22 of the collective bargaining agreement, entitled "Pensions" provides that:

The Company and the Union have agreed upon a pension program as detailed in the Agreement dated September 15, 1969, between the Company and the Union, including changes and/or amendments which shall continue in full force and effect until September 16, 1984, and as described in the attachment hereto as Appendix "C."

However, although Section 22 refers only to an "Agreement," there is, in fact, both a pension "agreement" and a pension "plan." The pension agreement was entered into by both the union and ABS, and was amended in 1972. The pension plan was effective as of September 1, 1972, and was signed by only ABS; however, the union and ABS did bargain over amendments to the plan despite the fact that the collective bargaining agreements only referred to the pension agreement.

### A. *The retirement supplement.*

The pension agreement contains a provision for early retirement noted as "70/80

retirement." Section 3.7 of the pension agreement provides for a $105.00 supplement to be paid to workers taking 70/80 retirement until they are eligible for social security:

In a determination of an amount of any regular pension for 70/80 Retirement, the monthly amount determined shall be increased by One Hundred Five dollars ($105.00); provided, however, that such increase shall not be applicable with respect to such regular pension payable for any month for which the participant is eligible for public pension.

For the most part, the pension plan and pension agreement are identical. However, they differ as to the limitation of ABS's liability to the pension plan, and as to the recourse that plan beneficiaries have against ABS. Section 11.2 of the pension agreement states that:

Any continuation of benefits properly payable pursuant to this agreement shall continue to be payable, notwithstanding the termination or expiration of this agreement.

However, §§ 8.2 and 8.3 of the pension plan provide, in relevant part:

8.2 *Contributions to the Pension Fund*

The Company intends to make such contributions to the Pension Fund for the purpose of providing pensions under the Plan as shall be required under accepted actuarial principles to maintain the Plan and Pension Fund in a sound condition and shall pay for the expenses incident to the operation of the Plan, as authorized by the Company. Company contributions after September 1, 1976 shall be in amounts not less than sufficient to satisfy the minimum funding standard or the alternative minimum funding standard prescribed by Title I of the Employee Retirement Income Security Act of 1974, unless satisfaction of such standard is waived in accordance with such Act. Any forfeitures arising from the severance of employment or death of a participant, or for any reason, will be used to reduce company contributions under the

Plan and will not be applied to increase the benefits any participant would otherwise receive under the Plan at any time prior to the termination of the Plan or prior to the permanent discontinuance of Company contributions to the Pension Fund. No participant shall be required to contribute to the Plan.

8.3 *Reversion and Limitation of Liability for Payment of Benefits*

The Company shall have no right, title or interest in the contributions made by it to the Pension Fund and no part of the Pension Fund shall revert to the Company, except that after satisfaction of all liabilities of the Plan as set forth in Article XI, any excess as the result of an erroneous calculation may revert to the Company.

The pension benefits of the Plan shall be only such as can be provided by the assets of the Pension Fund, and there shall be no liability or obligation on the part of the Company to make any further contributions to the Pension Fund in event of termination of the Plan. To the extent permitted by applicable law, no liability for the payment of pension benefits under the Plan shall be imposed upon the Company, the officers, directors or stockholders of the Company.

Section 9.1 of the pension plan contains a provision which purports to resolve conflicts between the pension plan and the pension agreement:

If in any case there shall be a conflict between any provision of this Plan and an applicable provision in a Pension Agreement which is binding upon [ABS], then in such event such provision in the Pension Agreement shall supersede the provision in the Plan to the extent necessary to eliminate such conflict.

On August 30, 1983, ABS terminated the pension plan. The Pension Benefit Guaranty Corporation ("PBG") took over as trustee on March 29, 1984. At that time, the payment of the $105.00 supplement ceased. In May of 1987, ABS resumed the payments and sent a letter to all eligible retirees which stated, in relevant part:

Please be advised for all the reasons payments were made from November of 1982 through July 6 of 1984, it is our intention to begin making payments again on May 1, 1987 until our obligation is complete. All monthly payments of $105.00 payable between August of 1984 and April of 1987 will be brought current on or before October 31, 1988. Since over 60 annuitants are involved, this expense is approximately $529,000.00. It will take up to 18 months to bring this obligation current, and we appreciate your patience.

These supplemental payments were again terminated upon the ruling of the district court that no duty to pay them existed.

B. *The two-year "creep-in."*

Section 8.05 of the 1981–1984 collective bargaining agreement states that:

Laid-off employees with two years or more continuous service at the time of lay-off will continue to accumulate seniority for a period equal to the length of continuous service at the time of lay-off.

Section 5.1(a) of the Pension Plan and § 5.1(a) of the Pension Agreement state that:

[T]here shall be no deduction for time lost which does not constitute a break in continuous service, except that; in determining length of continuous service for pensions purposes, (i) that portion of any absence which continues beyond two (2) years from commencement of absence due to a lay-off or physical disability shall not be creditable as continuous service.

Section 5.1(b) of both the Pension Plan and Pension Agreement state that continuous service shall be broken by:

1. Quit;

2. Discharge, provided that if the employee is rehired within six (6) months the break in continuous service shall be removed;

3. If and when termination occurs pursuant to the basic agreement due to the permanent shutdown of the plan, department or sub-division thereof;

4. Absence which continues for more than two (2) years.

## II.

■ Plaintiffs argue, because the October 22 notice informed employees that they were to be "permanently *laid off,*" § 5.1(b)(4) of both the pension plan and the agreement operates with § 5.1(a) of both the pension plan and agreement to entitle plaintiffs to a two-year "creep-in;" i.e., an accumulation of seniority under the plan for two years after the Ashtabula plant was shut down by ABS. We agree with the district court's rejection of this argument:

Section 5.1(b)(3) states that continuous service shall be broken by "termination (if and when termination occurs pursuant to the [collective bargaining agreement]) due to permanent shutdown of a plan, department or subdivision thereof." Plaintiffs argue that ABS knew the contract language as well as they did, and had they meant for plaintiffs to be "terminated" they would have said so. Therefore, they argue, plaintiffs were laid off, not terminated, and the continuous service was not broken. Plaintiffs do concede that if they were terminated, their continuous service would be broken and they would not be entitled to the two year creep-in ...

The Court finds plaintiffs' argument completely without merit. The notice stated that the employees were to be "permanently laid off;" that the plant would be "permanent[ly] shut-down;" and that ABS would "permanently cease all production." It is also clear that the employees knew that the plant was to be closed and that they would not be re-hired ...

"Permanent lay-off" is a euphemism; companies use it because it sounds better than "fired, never to be hired again." Nevertheless, it means exactly that. The term does not mean lay-off[,] a temporary forced leave; nor is it in any sense a leave of absence. Section 9.1(b)(3) clearly states that continuous service shall be broken by "termination ... due to per-manent shut down of a plant." This is what happened here, whatever language ABS used in the notice to its employees.

Memorandum and Order of July 28, 1988 at 10–11. We, therefore, affirm the district court's denial of the two-year "creep-in."

## III.

Plaintiffs further argue that they are entitled to a $105.00 monthly retirement supplement under § 3.7 of the pension agreement. ABS answers this argument with the assertion that the limitation provisions of the pension plan (set forth in Section I, *supra* ), coupled with ABS's right to terminate the plan under § 11 of the pension plan, limit ABS's liability and plaintiffs' right to benefits to the extent that the plan is funded according to sound actuarial principles. Despite § 11.2 of the pension agreement, which purports to preserve the payment of benefits payable pursuant to the pension agreement whether or not the pension agreement is terminated and § 9.1 of the pension plan, which purports to resolve conflicts between the pension agreement and pension plan in favor of the pension agreement, the district court found that ABS's liability was indeed limited to the extent that the plan was properly funded:

The Court concludes that although the collective bargaining agreement refers only to the pension agreement, the pension plan is also part of the collective bargaining agreement. The Court accepts ABS's argument that if the parties did not believe that the plan was part of their labor agreement, they would not have bargained over it. Therefore, it is the Court's task to reconcile these two writings, if at all possible.

Despite § 9.1 of the plan, which states that in conflicts between the plan and the agreement, the agreement is to prevail, this hardly ends the matter, for the question still remains whether a conflict actually exists.

The Court believes that the plan and the agreement can, in fact, be reconciled. The agreement states that benefits will not be discontinued despite the termination of the

agreement. Section 8.3 of the plan states that the pension benefits are payable only insofar as there is money in the fund to pay them; section 8.2 requires ABS to contribute to the fund in accordance with accepted actuarial principles and the minimum funding standards of ERISA. Reconciling these provisions is actually rather simple: the two writings in tandem provide that even if the plan or agreement is terminated, benefits will continue to be provided; in other words, the benefits are vested, excepe [sic] that if the fund would not have enough money to pay all the benefits, none of the benefits will be paid. In any event, if ABS terminates the plan, and has funded it properly, its liability ceases.

Plaintiffs argue that § 11.2 of the agreement gives them vested benefits which may never be reduced. The Court cannot accept this reasoning, for it would render void §§ 8.3 and 11.2 of the plan. The Court also believed that § 11.2 of the agreement was not intended to be interpreted as plaintiffs now wish. The Court notes that the agreement stated that it was to expire in three years, and that the date of its expiration, and the dates which were amended during each collective bargaining session, match the expiration dates of the main labor contract. It thus seems to the Court that a perfectly plausible interpretation of this clause is not that it provides vested benefits, although it might, but that the benefits were not to change until the parties had agreed upon new terms.

While the Court believes that the parties could have written their agreement more carefully, the

> Court's interpretation gives effect to all provisions of the writings and has the advantage of furthering one plain purpose of the parties—to limit ABS's liability once ERISA allowed it to do so. The Court also notes that the plan was promulgated after the agreement, and it is logical to assume that the parties meant for the plan's very specific limitation on ABS's liability, and very specific clause regarding the extent of retiree benefits, to prevail over the agreement's more vague provision that no benefits would

be reduced despite the expiration or termination of the agreement.

■ Our examination of the pension agreement and the pension plan, however, leads us to a different conclusion. Section 115 of the pension agreement clearly states that any benefit properly payable pursuant to the pension agreement, which must include the retirement supplement, shall continue to be payable notwithstanding the termination of the pension agreement. Although § 8.3 of the pension plan limits benefits to the extent that they have been funded prior to the termination of the plan, § 9.1 of the pension plan clearly provides that if there is a conflict between a pension plan provision and a pension agreement provision, the pension *agreement* supersedes the pension *plan*.

ABS argues that the adoption of the pension plan provisions limiting their liability was in response to the enactment of ERISA and the resulting ability to limit liability due to the formation of a federal corporation to ensure pension benefits upon plan termination. Thus, ABS concludes, the pension plan is the most accurate description of ABS's liability. However, ERISA's limitation of pension payments "does not limit the employer's direct contractual liability to its employees." *Murphy v. Heppenstall Co.*, 635 F.2d 233, 238 (3d. Cir.1980), *cert. denied*, 454 U.S. 1142, 102 S.Ct. 999, 71 L.Ed.2d 293 (1982). Because the contractual language of the pension agreement provides that the retirement supplement is to be paid regardless of termination of the agreement, and because the pension agreement supersedes the plan, the retirement supplement is an independent obligation which ABS is required to pay.

Moreover, if we are to determine the intent of the parties, the most direct evidence of whether ABS believed that it had an obligation to pay the retirement supplement—the May, 1987 letter from the president of ABS to all eligible retirees—indicates that ABS indeed believed that such an obligation existed:

> Please be advised for all the reasons payments were made from November of 1982 through July of 1984, it is our inten-

tion to begin making payments again on May 1, 1987 until our obligation is complete.

We, therefore, conclude that plaintiffs are entitled to payment of the retirement supplement.[1]

### IV.

Accordingly, for the foregoing reasons, we reverse the judgment below inasmuch as it found that ABS is not liable for plaintiffs' supplemental pension benefits, and remand for proceedings consistent with this opinion. In all other respects, the judgment is affirmed.[2]

1. Even though the May, 1987 letter from the president of ABS to all eligible retirees may be deemed extrinsic evidence, our decision to consider the president's letter is justified by this court's recent decision in *International Union, UAW Local 91 v. Park–Ohio Industries, Inc.,* 876 F.2d 894 (6th Cir.1989) (No. 88–3145, unpublished per curiam). In *Park–Ohio Industries,* the union argued that the employer had failed to pay retirement and health insurance benefits mandated by the collective bargaining agreement. To aid in the interpretation of the collective bargaining agreement, this court considered the parties' extrinsic evidence, reasoning that:

> [B]oth parties have offered plausible interpretations of the agreement drawn from the contractual language itself [which] demonstrates that the provision is ambiguous. Neither of the two proffered interpretations is

frivolous nor unreasonable on its face, and inquiry should be permitted into extrinsic circumstances. *See Strauss v. Silvercup Bakers, Inc.,* 353 F.2d 555, 558 (2d Cir.1965).

*Park–Ohio Industries,* 876 F.2d 894. Similarly, in the case at bar, both ABS and the plaintiffs have presented plausible interpretations of the contractual language of the pension agreement. Thus, extrinsic evidence may be properly introduced to resolve the ambiguity. *See id.; International Union, UAW Local 134 v. Yard–May, Inc.,* 716 F.2d 1476, 1480 (6th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984).

2. Plaintiffs also raised several claims under ERISA which were rejected by the district court. We find no error in the disposition of those claims by the district court.