**UNITED STEELWORKERS OF AMERICA, AFL–CIO, CLC,**
Plaintiff–Appellant,

v.

**UNITED ENGINEERING, INC.,**
et al., Defendants–Appellees.

No. 94–3014.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 23, 1995.

Decided May 2, 1995.

**1388**

Jeremiah A. Collins (argued), Francis R. Sheed (briefed), Bredhoff & Kaiser, Washington, DC, David M. Fusco, Schwarzwald & Rock, Cleveland, OH, for United Steelworkers of America, AFL–CIO, CLC.

Michael J. Ranallo, Millisor & Nobil, Cleveland, OH, Joseph M. Gagliardo (briefed), Laner, Muchin, Dombrow, Becker, Levin & Tominberg, Chicago, IL, for United Engineering, Inc., United Stroup Intern., Inc., United Foundries, Inc.

Arthur I. Harris, Asst. U.S. Atty., Office of the U.S. Atty., Cleveland, OH, Jeffrey B. Cohen, John A. Menke (argued), Charles M. Dyke (briefed), Pension Benefit Guar. Corp., Office of the Gen. Counsel, Washington, DC, for Pension Benefit Guar. Corp.

Before: RYAN and SILER, Circuit Judges; MILES, District Judge.*

RYAN, Circuit Judge.

Plaintiff, United Steelworkers of America, appeals the order of the district court granting summary judgment for the defendants on the ground that the Employee Retirement Income Security Act (ERISA) preempts claims by employees for nonguaranteed pension benefits under § 301 of the Labor Management Relations Act (LMRA). We are asked to determine whether the 1986 and 1987 amendments to ERISA preempt a cause of action under the LMRA by employees and unions to recover nonguaranteed pension benefits.

We conclude that the district court did not err and we affirm the district court's order granting summary judgment for the defendants.

**I.**

The plaintiff, United Steelworkers of America, and Wean United, Inc. entered into several collective bargaining agreements which included the pension plan at issue in this case. The defendants, United Engineering, Inc. and related companies, are successors to Wean United and agreed to assume Wean's pension obligations.

Included in the collective bargaining agreement was the Wean United, Inc. Production and Maintenance Employees' Pension Agreement which provides that United Engineering would provide pension benefits even if the pension plan terminated and the funds in the plan were insufficient to pay the benefits. Included among the employee benefits were supplemental or nonguaranteed benefits payable to employees prior to retirement age in the event of a plant shutdown or physical disability.

In September 1988, United Engineering applied to the Pension Benefit Guaranty Corporation (PBGC) for a distress termination of the pension plan. Shortly thereafter, two

---

* The Honorable Wendell A. Miles, United States District Judge for the Western District of Michigan, sitting by designation.

class action lawsuits were filed against United Engineering and the PBGC. One suit, *United Steelworkers of America v. United Engineering, Inc.,* was brought by the union in an attempt to enjoin the termination of the pension plan. The second class action, *Humble v. United Engineering, Inc.,* was brought by several individual United Engineering employees who alleged that terminating the plan would violate the collective bargaining agreement.

Both suits were settled in a joint agreement. Under the settlement, the plaintiffs agreed that United Engineering could terminate the pension plan; United Engineering agreed to pay part of the employees' claims for supplemental benefits; and the plaintiffs reserved the right to file a suit in federal court for any unpaid benefits.

On May 31, 1990, the PBGC and United Engineering entered into a trusteeship agreement which named the PBGC trustee of the pension plan. United Engineering and the PBGC also entered into an Employer Liability Settlement Agreement which settled the obligations of United Engineering to the PBGC for all unfunded benefit liabilities. The agreement required United Engineering to make payments to the PBGC.

The union claims that the settlement between the PBGC and United Engineering will not yield enough funds for the payment of supplemental benefits to employees. Therefore, the union filed an amended complaint against United Engineering and the PBGC, in the United States District Court for the Northern District of Ohio, seeking payment of supplemental pension benefits. The union filed the action under § 301 of the LMRA, 29 U.S.C. § 185, and under ERISA, 29 U.S.C. § 1104 (1985 and Supp.1994), § 1109 (1985), and § 1132(a)(1)(B) (1985).

United Engineering and the PBGC moved for summary judgment on the ground that any cause of action by the employees against the employer for supplemental benefits is preempted by ERISA.

The district court held that ERISA, as amended in 1986 and 1987, preempts federal "common law" actions directly against the employer under the LMRA for payment of nonguaranteed pension benefits. *United Steelworkers of Am. v. United Eng'g, Inc.,* 839 F.Supp. 1279, 1285 (N.D. Ohio 1993). The court relied on the explicit language of 29 U.S.C. § 1362(b)(1)(A) (Supp.1994), which states that employers are liable *to the PBGC* for "the total amount of the unfunded benefit liabilities," and 29 U.S.C. § 1322(c) (Supp. 1994), which requires the PBGC to pay the nonguaranteed benefits from the money it recovers from the employer, and held that permitting an action by the union "would defeat the pension plan termination framework set out in ERISA. If individual employees could sue the employer directly for non-guaranteed benefits, the priority scheme set out in ERISA for payment of claims by the PBGC would be rendered meaningless." *Id.* at 1283.

Accordingly, the district court granted summary judgment for the defendants. The plaintiff appeals and urges this court to reverse.

## II.

The plaintiff argues that the 1986 and 1987 amendments to ERISA do not preempt causes of action under § 301 of the LMRA to enforce collective bargaining agreements. The union argues that Congress evinced no intent, either in the statutory language or in the legislative history, to preempt § 301 suits. Congress's silence is significant, the union claims, because before the 1986 and 1987 amendments, Congress knew that courts had recognized a cause of action under § 301 to recover nonguaranteed pension benefits. The union also maintains that there is no irreconcilable conflict between ERISA and § 301 suits.

The PBGC responds that the 1986 and 1987 amendments to ERISA do preempt actions under § 301. The PBGC contends that the language of the amendments expresses congressional intent to preempt suits directly against the employer by expressly making employers liable only to the PBGC and the trustee. First, the PBGC points to 29 U.S.C. § 1362(a) (Supp.1994) which states that "[t]he liability under this section *consists of*—(1) liability to the [PBGC], to the extent provided in subsection (b) of this section, and

(2) liability to the trustee. . . ." (Emphasis added.) The PBGC argues that by using the word "consists" instead of "includes," Congress intended that employers be liable only to the PBGC and the trustee. Second, 29 U.S.C. § 1362(b)(1)(A) states that the employer's liability to the PBGC "shall be the total amount of the unfunded benefit liabilities (as of the termination date) to all participants and beneficiaries under the plan."

The PBGC also argues that 29 U.S.C. § 1322 would be superfluous if § 301 actions were permitted. Section 1322 establishes a scheme by which the PBGC recovers money from the plan sponsor (usually the employer) and then pays the guaranteed and nonguaranteed benefits to the employees.

Finally, the PBGC explains that § 301 suits to recover nonguaranteed pension benefits were established by the courts through federal common law to fill a gap that Congress had left in the statutory structure of ERISA, which, until 1986 and 1987, was silent with respect to the collection and payment of nonguaranteed benefits. The 1986 and 1987 amendments closed the gap, thereby displacing the federal common law remedy.

### III.

■ The court's review of a grant of summary judgment is *de novo;* it uses the same test as used by the district court. *Brooks v. American Broadcasting Cos.,* 932 F.2d 495, 500 (6th Cir.1991). In reviewing summary judgment motions, courts must view the evidence in the light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Under Fed.R.Civ.P. 56(c), summary judgment is proper if all the evidence before the district court " 'show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to [a] judgment as a matter of law.' " *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.,* 862 F.2d 597, 601 (6th Cir.1988) (quoting Fed.R.Civ.P. 56(c)). Once the moving party has met its burden of production, the nonmoving party must go beyond the pleadings, and by affida-

vits, or by " 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(e)).

### IV.

The provisions of ERISA at issue in this case, 29 U.S.C. § 1001 *et seq.,* are a type of insurance designed to ensure that employees are not deprived of retirement benefits in the event that a pension plan is terminated before sufficient funds are accumulated in the plan. The PBGC was created to administer and enforce the insurance provisions of ERISA. 29 U.S.C. § 1302(a) (1985). The PBGC is a United States government corporation.

When an employer terminates a single-employer pension plan with insufficient assets to pay promised benefits, the PBGC becomes the trustee of the plan and pays participants their benefits under the plan subject to various limitations and priorities set out in 29 U.S.C. §§ 1322 and 1344 (1985 and Supp.1994). The funds the PBGC uses to pay benefits are derived from the funds existing in the pension plan. The deficiency in the funds is covered by the PBGC's insurance funds which are derived from premiums paid by sponsors of pension plans. 29 U.S.C. § 1306 (1985 and Supp.1994), § 1307 (Supp. 1994).

When an employer terminates a pension plan with insufficient funds, the employer becomes liable to the PBGC for "the total amount of the unfunded benefit liabilities (as of the termination date) to all participants and beneficiaries under the plan." 29 U.S.C. § 1362(b)(1)(A).

■ As set out in 29 U.S.C. § 1322, the PBGC does not cover all pension benefits. The PBGC guarantees payment of "nonforfeitable benefits." 29 U.S.C. § 1322. "Nonforfeitable benefits" are defined as benefits "for which a participant has satisfied the conditions for entitlement under the plan." 29 U.S.C. § 1301(a)(8) (1985). In other

words, nonforfeitable benefits are vested benefits.

Prior to the 1986 and 1987 amendments to ERISA, an employer was liable to the PBGC only for the lesser of the unfunded guaranteed benefits or 30% of the employer's net worth, 29 U.S.C. § 1362(b)(2)(B) (Supp. 1994), and the PBGC was obligated to pay only guaranteed benefits under 29 U.S.C. § 1322. The employer was not liable to the PBGC or to anyone else under the former statutory scheme for unfunded *non* guaranteed benefits.

The benefits involved in this case are those that are payable before the normal retirement age of 65 and are not guaranteed by the PBGC. 29 U.S.C. § 1322(b)(3) (1985).

Many federal courts, including this circuit, perceived a gap in the statutory structure of ERISA regarding the payment of unfunded nonguaranteed pension benefits. They recognized, therefore, a federal common law action allowing employees to directly sue their employers to recover nonguaranteed benefits.

For example, in *Murphy v. Heppenstall Co.*, 635 F.2d 233 (3d Cir.1980), *cert. denied*, 454 U.S. 1142, 102 S.Ct. 999, 71 L.Ed.2d 293 (1982), employees sought to recover nonguaranteed benefits directly from their employer by means of a § 301 suit. The Third Circuit found for the employees, holding that ERISA did not limit the employer's direct contractual liability to its employees. *Id.* at 239. The court explained that the employees' claims arose under federal common law and, therefore, federal common law applied to the suit which sought to uphold a provision of a collectively bargained pension agreement. *Id.* at 237 (citing *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 456–57, 77 S.Ct. 912, 917–18, 1 L.Ed.2d 972 (1957)).

Several cases in this circuit followed *Heppenstall*. In *United Steelworkers of America v. North Bend Terminal Co.*, 752 F.2d 256 (6th Cir.1985), this court, referring to *Heppenstall*, stated that ERISA's statutory scheme does not limit an employer's liability and that a pension plan can be an independent source of liability. *Id.* at 259. In *Haytcher v. ABS Industries, Inc.*, 889 F.2d 64 (6th Cir.1989), this court reiterated that "ERISA's limitation of pension payment 'does not limit the employer's direct contractual liability to its employees.'" *Id.* at 68 (quoting *Heppenstall*, 635 F.2d at 238).

In 1986, Congress addressed, for the first time, the protection of nonguaranteed pension benefits and amended ERISA by enacting the Single–Employer Pension Plan Amendments Act (SEPPAA), 29 U.S.C. § 1349 (repealed 1987). SEPPAA established a trust fund called the "Section 4049 trust" that would receive funds from employers and distribute those funds to plan participants to cover nonguaranteed benefits. SEPPAA made employers liable to the trustee for up to 75% of the amount of nonguaranteed benefits.

In 1987, Congress repealed SEPPAA and enacted the Pension Protection Act (PPA), 29 U.S.C. § 1362 (Supp.1994), which is the current law regarding payment of unfunded pension benefits. The PPA provides that the liability of an employer who terminates a pension plan to the PBGC "shall be the total amount of the unfunded benefit liabilities (as of the termination date) to all participants and beneficiaries under the plan." 29 U.S.C. § 1362(b)(1)(A).

As before the amendments, the PBGC is still required to pay all guaranteed benefits. Since the amendments, however, the PBGC must pay some portion of the nonguaranteed benefits. The portion is determined by the amount the PBGC recovers from the employer and the amount due to participants. Specifically, the amount of nonguaranteed benefits to be paid is determined by multiplying the amount of the pension plan's unfunded nonguaranteed benefits by a fraction; the numerator of the fraction is the amount of the PBGC's total recovery from the employer and the denominator is the total amount of unfunded benefit liabilities in the plan on the termination date. 29 U.S.C. §§ 1322(c)(2), 1322(c)(3)(A) (Supp. 1994). The PBGC then allocates the nonguaranteed amounts according to the priority scheme set out in 29 U.S.C. § 1344(a) (1985 and Supp.1994).

Several courts that have addressed the issue that confronts us today have held that ERISA now preempts direct actions against the employer. For example, the court in *In re Adams Hard Facing Co.*, 129 B.R. 662 (W.D.Okla.1991), held that participants in a pension plan could not recover monies directly from their employer's bankruptcy estate. *Id.* at 663. In so holding, the court stated:

> The debtors and the PBGC agree that if Plan participants make claims directly against the bankruptcy estate, the purposes of ERISA § 4022(c) [ (29 U.S.C. § 1322(c)) ] will be defeated. Under ERISA, the PBGC must collect the employer's unfunded benefit liabilities and distribute those amounts to plan participants within the priority scheme of § 4044(a) [ (29 U.S.C. § 1344) ]. The direct claims of the participants in the ... Plan are therefore disallowed. The PBGC is instructed to collect and allocate the unfunded benefit liability amounts in strict compliance with ... ERISA....

*Id.*

Similarly, *International Association of Machinists & Aerospace Workers v. Rome Cable Corp.*, 810 F.Supp. 402 (N.D.N.Y.1993), held that employees could not maintain a suit against their employer to recover benefits that were to be paid by the PBGC. *Id.* at 407–08. Although the now repealed SEPPAA applied to the case, the reasoning of the court is still relevant under PPA. The court stated:

> The SEPPAA scheme is intended to limit employer liability to the PBGC, which is in turn liable to the terminated plan's participants and beneficiaries to the full extent of the funding deficiency with respect to the guaranteed benefits. In so doing, the employer, who is then no longer liable to the plan participants and beneficiaries, may work out an agreement with the PBGC for payment of the funds out of which the benefits are payable, thereby utilizing its limited assets so as to enure its continued operation and thus continued employment of plan participants. Thus, the goals of the statutory scheme would be satisfied. It would be counterproductive indeed to find that the employer would,

following a distress termination, be liable not only to the PBGC but also remain liable to the plan participants and beneficiaries.

*Id.* at 407 (citations omitted). The court arrived at this result through application of the law of trusts. The court analogized the relationship between the PBGC and plan participants to the relationship between a trustee and its beneficiaries. The court explained that the PBGC, as the trustee, binds the employees, the trust beneficiaries, thereby discharging the obligations of the employer. *Id.* at 406 (citing III Scott on Trusts § 142 (4th ed.); Restatement (Second) of Trusts § 192 (1987)). When the employer and the PBGC enter into a settlement agreement, the PBGC stands in the shoes of the employer. *Id.* The court further reasoned that if the employees think the settlement agreement between the PBGC and the employer is unfair or diminishes their rights, their remedy, as with any trust beneficiary, is to sue the PBGC as trustee, not to sue the employer directly. *Id.*

The PBGC argues that *Illinois v. City of Milwaukee*, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972) (*Milwaukee I*), and *City of Milwaukee v. Illinois*, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) (*Milwaukee II*), are analogous to the case at hand. In *Milwaukee II*, the issue was whether a federal common law cause of action created by the United States Supreme Court under the Federal Water Pollution Control Act survived subsequent amendment of the Act by Congress. 33 U.S.C. § 1251. In *Milwaukee I*, the Court held that Illinois could bring suit to abate the public nuisance created by Wisconsin cities when they dumped raw sewage into Lake Michigan. *Milwaukee I* at 108, 92 S.Ct. at 1395. The Court acknowledged that it was creating federal common law in allowing the action. *Id.* at 103–04, 92 S.Ct. at 1392–93. In noting that it was not unusual for federal courts to fashion federal law, the Court cited to *Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), *id.* at 103, 92 S.Ct. at 1392, in which the Court permitted federal courts to fashion common law to be applied in § 301 suits under the LMRA. The Court warned, however, that "new federal

laws and new federal regulations may in time pre-empt the field of federal common law of nuisance." *Id.* at 107, 92 S.Ct. at 1394–95.

After *Milwaukee I,* Congress amended the Federal Water Pollution Control Act. In *Milwaukee II,* the Supreme Court held that the amendments to the Federal Water Pollution Control Act displaced prior federal common law. The amendments established a new system of regulation making it illegal to discharge pollutants into the nation's waters except pursuant to a permit and regulations promulgated by the Environmental Protection Agency. Writing for the majority, Justice Rehnquist stated:

> [W]hen Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of lawmaking by federal courts disappears....
>
> ....
>
> Thus, the question [is] whether the legislative scheme "[speaks] directly to a question" ... not whether Congress had affirmatively proscribed the use of federal common law.

451 U.S. at 314–15, 101 S.Ct. at 1791. The Court further commented:

> Our "commitment to the separation of powers is too fundamental" to continue to rely on federal common law "by judicially decreeing what accords with 'common sense and the public weal'" when Congress had addressed the problem.

*Id.* at 315, 101 S.Ct. at 1791 (quoting *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 195, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978)).

■■■ The Court also clarified the test to be applied in a case where the issue is whether a federal statute displaces federal common law. The test is not the same test that is applied in determining whether federal law preempts state law. Therefore, a manifest and clear purpose need not be shown to displace federal common law. *Id.* at 316–17, 101 S.Ct. at 1792. Rather, the question to be asked is whether Congress has occupied the field. *Id.* at 324, 101 S.Ct. at 1796.

In *Milwaukee II,* the Court held that Congress occupied the field of nuisance jurisprudence by the establishment of a comprehensive regulatory program supervised by an expert administrative agency, the Environmental Protection Agency. *Id.* at 317, 101 S.Ct. at 1792–93.

## V.

■■■ We conclude that the district court's order granting judgment was proper for several reasons. First, although the plain language of the ERISA amendments does not explicitly declare whether direct suits against plan sponsors are prohibited, the language strongly implies that Congress intended the PBGC to be the sole source of recovery of payments to employees. ERISA states that the liability of an employer that terminates a pension plan to the PBGC "shall be the *total* amount of the unfunded benefit liabilities (as of the termination date) to all participants and beneficiaries under the plan." 29 U.S.C. § 1362(b)(1)(A) (emphasis added). In other words, *all* unfunded benefits are payable to the PBGC. Furthermore, ERISA now states that the PBGC is responsible for disbursing nonguaranteed benefits in accordance with a precise formula as set out in 29 U.S.C. §§ 1322(c)(2), 1322(c)(3)(A). The statute establishes a detailed priority scheme by which the PBGC allocates the nonguaranteed amounts. 29 U.S.C. § 1344(a). These detailed provisions seem to allocate all responsibility for disbursement of nonguaranteed benefits to the PBGC, strongly suggesting that suits against plan sponsors to recover those same benefits are precluded.

Second, *Milwaukee I* and *Milwaukee II* are analogous to the case at hand. As in the Federal Water Pollution Control Act, a gap existed in the statutory structure of ERISA. Specifically, payment of unfunded nonguaranteed benefits was not addressed. To fill the void, federal courts created a cause of action under § 301 of the LMRA, allowing employees to sue the plan sponsors directly to recover nonguaranteed benefits. *See, e.g., Heppenstall,* 635 F.2d 233; *see also Haytcher,* 889 F.2d 64; *North Bend Terminal,* 752 F.2d 256.

Within a few years, first in 1986 and again in 1987, Congress addressed the matter of payment of nonguaranteed benefits that had been governed by federal judge-made law. The result is that ERISA now speaks directly to the issue of nonguaranteed benefits. It is true that Congress did not, in the SEP-PAA or PPA amendments, affirmatively proscribe the judge-made § 301 cause of action, but *Milwaukee II* teaches that affirmative proscription is not required for Congress to displace federal common law.

Thus, because Congress has now spoken directly to the issue of nonguaranteed benefits, the need for the extraordinary exercise of federal judicial lawmaking, that prompted creation of the § 301 cause of action for the payment of such benefits, disappears.

Third, the district court's reliance on *In re Adams Hard Facing*, 129 B.R. 662, was proper. As the court in *In re Adams* stated, if plan participants make claims directly against their employer, the purposes of ERISA will be defeated. In particular, the priority scheme set out in 29 U.S.C. § 1344(a) for payment of ERISA benefits would be rendered meaningless. Congress specifically addressed nonguaranteed benefits in 29 U.S.C. § 1344 and assigned them a low priority. To allow a private right of action against the employer would contravene Congress's intent to disburse guaranteed benefits before nonguaranteed benefits.

Allowing plan participants to bring suit directly against the plan sponsor also raises the possibility of double recovery. If § 301 suits were permitted, those employees who recover from the employer could again receive payments for the PBGC under the current statutory scheme. We have no doubt that Congress did not intend to permit this kind of double-dipping.

The union argues that SEPPAA and the PPA do not preempt § 301 suits because Congress, knowing that federal courts were allowing § 301 suits, did not address the issue in the ERISA amendments. In other words, the union argues, congressional silence constitutes congressional acquiescence.

Although the Supreme Court has treated congressional silence arguments inconsistent-ly over the years, the Court's latest statement on the matter is found in *Central Bank of Denver v. First Interstate Bank of Denver*, —— U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). In *Central Bank*, the respondents argued that because Congress was aware that courts were allowing aiding and abetting liability under § 10(b) of the Securities Exchange Act of 1934 and amended § 10(b) on various occasions without proscribing accomplice liability, then Congress must have acquiesced in the judicial interpretations of § 10(b). Justice Kennedy, writing for the majority in response to the respondents' arguments, affirmatively states:

> [O]ur observations on the acquiescence doctrine indicate its limitations as an expression of congressional intent. "It does not follow ... that Congress' failure to overturn a statutory precedent is reason for this Court to adhere to it. It is 'impossible to assert with any degree of assurance that congressional failure to act represents' affirmative congressional approval of the [courts'] statutory interpretation.... Congress may legislate, moreover, only through passage of a bill which is approved by both Houses and signed by the President."

*Id.* at ——, 114 S.Ct. at 1453 (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 175 n. 1, 109 S.Ct. 2363, 2371 n. 1, 105 L.Ed.2d 132 (1989)) (quoting *Johnson v. Transportation Agency, Santa Clara County*, 480 U.S. 616, 671–72, 107 S.Ct. 1442, 1472, 94 L.Ed.2d 615 (1987) (Scalia, J., dissenting)).

## VI.

Thus, because of the detailed statutory language and because Congress has preemptively occupied a field previously addressed by federal common law, suits under § 301 of the Labor Management Relations Act to recover nonguaranteed benefits from plan sponsors are precluded.

Accordingly, the judgment of the district court is AFFIRMED.