PRIME HEALTHCARE SERVICES— LANDMARK, LLC, Plaintiff,

v.

UNITED NURSES & ALLIED PROFESSIONALS, LOCAL 5067, Defendant.

C.A. No. 14–219L

United States District Court, D. Rhode Island.

Signed January 21, 2016

· Anthony D. Rizzotti, ·Jillian S. Folger–Hartwell, · Littler Mendelson, PC, Providence, RI, David C. Casey; Littler Mendelson, PC, Boston, MA, for Plaintiff.

Christopher Callaci, United Nurse & Allied Professionals, Providence, RI, for Defendant.

### MEMORANDUM AND ORDER

Ronald R. Lagueux, Senior United States District Judge

This matter is before the Court on the parties' cross motions for partial summary judgment on Count I of Plaintiff's Petition for. Declaratory Judgment ("Petition"). Plaintiff is· Prime Health Care Services ("Prime"), which purchased the Landmark Medical Center ("Landmark"), a financially-troubled hospital in Woonsocket, Rhode Island, in December 2013. This purchase created a new, hyphenated entity, Prime Healthcare , Services–Landmark, LLC, which will be identified simply as "Prime" herein. Defendant, United Nurses & Allied Professionals, Local 5067 ("UNAP"), is a union local which represented Landmark's employees, pursuant to a collective bargaining agreement. That agreement was taken over and amended by Prime when it purchased Landmark's assets and hired its workforce. UNAP has sought to arbitrate a grievance with Prime that was pending .against Landmark at the time of the purchase. Prime filed this action seeking, *inter alia*, a declaration from this Court that UNAP's grievance is not arbitrable. The Court, having heard oral argument and reviewed the parties' submissions,· now grants Plaintiff's motion for

partial summary judgment on Count I of its Petition for the reasons explained below.

### Background

UNAP and Landmark were parties to a collective bargaining agreement, in effect from 2006 to 2009 and automatically renewable every year unless its terms were reopened by either party. Article 9.1 of that contract provided that any unresolved disputes "concerning the interpretation, application or meaning" of its provisions could be submitted to arbitration with the American Arbitration Association. The contract also included a defined benefit retirement plan for Landmark employees.

Because of Landmark's financial problems, on June 26, 2008, Judge Michael Silverstein of the Providence Superior Court appointed a Temporary Special Master to oversee its continued operations. The Special Master, whose appointment became permanent on July 25, 2008, was also charged with making the minimum required contributions to the Retirement Plan.

In 2012, Prime stepped in with an offer to buy Landmark's assets. Prime met with UNAP and agreed that it would take over Landmark's contract with its employees. A cover memorandum was signed on October 10, 2012, accompanying the amended contract. It stated that "Prime shall recognize and continue to process any and all grievances and/or labor arbitrations pending at the time of the closing pursuant to the CBAs referenced herein." The cover memorandum also included a paragraph stating:

> To the extent that there are any inconsistencies between the terms of this Memorandum of Agreement and the Asset Purchase Agreement among the Court Appointed Special Master for Landmark Medical Center ... [and other related entities] and Prime, including

any and all relevant schedules and exhibits, the terms of this Memorandum of Agreement and Exhibits A, B, and C shall govern as it relates to employees represented by the Union.

The newly-negotiated collective bargaining agreement contained the same language concerning the right to arbitrate grievances included in the Landmark contract and previously quoted above.

### The PBGC

The Pension Benefit Guaranty Corporation ("PBGC") is a government agency created by Congress as part of the Employee Retirement Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1301–1461. It is a kind of insurance program designed to bail out underfunded pensions. The PBGC is funded through premiums paid by ERISA plans, and through assets acquired from plans under its trusteeship. According to Plaintiff's brief, the PBGC has served as a trustee for approximately 4,650 foundering defined benefit pension plans and has been paying (or would soon be paying) retirement benefits to approximately 1.5 American workers, as of the close of the 2014 fiscal year.

On June 5, 2013, the PBGC notified Landmark's Special Master that it intended to involuntarily terminate Landmark's defined benefit retirement plan because Landmark had failed to maintain minimum funding requirements. The following week, the Special Master petitioned the Providence Superior Court for authorization to enter into an agreement with the PBGC, under which the PBGC would terminate Landmark's Retirement Plan and be named its trustee, pursuant to 29 U.S.C. § 1342.

On July 1, 2013, UNAP filed a grievance against Landmark. The grievant was identified as "Class Action" and the griev-

ance was stated as "Terms of the define [sic] benefit pension plan is contrary to article 20.4 and other related articles." The requested remedy was "Make employees whole and other suitable remedies." This grievance was denied, and UNAP demanded that it be resolved through arbitration.

Next, the hearing on the Special Master's Petition was held on July 8, 2013. Prime made no appearance. UNAP appeared and objected to PBGC's takeover of the Retirement Plan. Judge Silverstein's order, dated July 9, 2013, provided:

1. That this Honorable Court finds that execution of the Termination Agreement is in the best interests of the Mastership Estate and hereby GRANTS the Petition, and authorizes the Special Master to execute the Termination Agreement, in the form appended to the Petition, forthwith.

2. That any and all rights and remedies of UNAP with respect to the employee retirement benefits are reserved.

The PBGC and the Special Master then entered into an Agreement for Appointment of Trustee and Termination of Plan. In the Agreement's recitals was included:

G. In or about October 2012, the Court authorized the Special Master, solely in his capacity as Court–Appointed Special Master, and not individually, to enter into an asset purchase agreement for the sale of certain specified assets of the Company; the asset purchase agreement does not include assumption of the [Retirement] Plan.

The Agreement also provided that Landmark and the Special Master were to con-

vey all assets of the Retirement Plan to the PBCG, which was vested with "all of the rights and powers of a trustee specified in ERISA or otherwise granted by law."[1] The PBGC filed claims against both Landmark and the Special Master for unpaid contributions owed to the Retirement Plan.

In October 2013, UNAP amended its grievance against Landmark to state, "The employer violated the governing Collective bargaining Agreement, particularly Article 20.4 and all other related provisions, when it changed the terms of the defined pension benefit provisions and ceased making contributions to employees pensions, in violation of the contract." The grievance was again denied by Landmark. UNAP filed a request for arbitration on November 8, 2013.

On November 26, 2013, Prime entered into the Asset Purchase Agreement with the Special Master to purchase Landmark. The court-approved Asset Purchase Agreement expressly stated that Prime would not assume or be responsible for "any Liability under any Benefit Plan and all administrative costs associated therewith."

On December 31, 2013, when the Asset Purchase Agreement became effective, Landmark terminated all of its employees. On January 1, 2014, some of those employees were hired back by Prime, and the new collective bargaining agreement, previously negotiated between Prime and UNAP in 2012, took effect. The new contract does not contain a retirement plan. In June of 2014, UNAP filed a grievance against Prime, stating that it violated the 2012 Memorandum of Agreement[2] by re-

---

1. While the Retirement Plan was terminated on June 7, 2013, the trusteeship was not effective until August 9, 2013, when the Agreement was fully executed.

2. As the reader may recall, in the pertinent provision of the Memorandum of Agreement, Prime agreed to recognize and process all grievances pending at the time of its purchase of Landmark. The Memorandum also stated

fusing to submit UNAP's pending grievance to arbitration. Prime's present Petition for Declaratory Judgment resulted.

### The Petition for Declaratory Judgment

Plaintiff's Petition for Declaratory Judgment comprises five counts. Count I, which is addressed herein, states that UNAP's grievance is not substantively arbitrable because it is preempted by ERISA. In Count II, Plaintiff seeks a declaration that, under the Asset Purchase Agreement, it did not assume any obligation to make pension contributions pursuant to Landmark's collective bargaining agreement with UNAP. Count III asserts that UNAP's collective bargaining agreement with Landmark had expired by the time UNAP filed its grievance, and that, consequently, the grievance did not survive past the contract's expiration and is not substantively arbitrable. Count IV seeks a declaration that Landmark never agreed or intended to arbitrate disputes over its Retirement Plan, and that arbitrations over these kinds of disputes were excluded by its collective bargaining agreement with UNAP. Finally, Count V seeks to enjoin UNAP from seeking arbitration over its grievance. In a Proposed Joint Scheduling Order (ECF #12, ¶1), the parties indicate that a summary judgment ruling on Count I may be dispositive of the entire case.

### Standard of Review

When ruling on a motion for summary judgment, the court must look to the record and view all the facts and inferences therefrom in the light most favorable to the nonmoving party. *Continental Cas. Co. v. Canadian Univ. Ins. Co.,* 924 F.2d 370, 373 (1st Cir.1991). Once this is done, Rule 56(c) requires that summary judg-

ment be granted if there is no issue as to any material fact and the moving party is entitled to judgment as a matter of law.

■ The analysis required for cross motions for summary judgment is the same. *Scottsdale Ins. Co. v. Torres,* 561 F.3d 74, 77 (1st Cir.2009) ("The presence of cross-motions neither dilutes nor distorts this standard of review."). In evaluating cross-motions, the court must determine whether or not either party is entitled to judgment as a matter of law based upon the undisputed facts. *Id.*

### Analysis

■ Some analysis of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.,* is required to understand the resolution of this dispute. ERISA was designed by Congress as a comprehensive statute to protect employees and their beneficiaries, and to safeguard their benefit plans, through the imposition of a uniform set of federal regulations, procedures and administrative standards. In order to avoid "[A] patchwork scheme of regulation [that] would introduce considerable inefficiencies in benefit program operation," Congress included a broad preemption provision, 29 U.S.C. § 1144, which operates to supercede most, if not all, state law actions brought in connection with employee welfare plans. *Fort Halifax Packing Co., Inc. v. Coyne,* 482 U.S. 1, 11, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987).

The framework of the Pension Benefit Guaranty Corporation is consistent with these stated purposes of ERISA. The statute provides that the PBGC may terminate and take over control of a single-employer pension plan when its sponsor

---

that its terms would govern in the event of inconsistencies between the Memorandum

and the Asset Purchase Agreement.

has failed to meet minimum funding requirements. 29 U.S.C. § 1342. The PBGC is then vested ·with the exclusive authority to collect all amounts owed to the terminated plan. 29 U.S.C. § 1362. These funds ·are augmented by funds collected by the PBGC through premiums imposed on the sponsors· of healthy pension plans. 29 U.S.C. §§ 1306 and 1307. Payments are made to the plan's participants according to a priority scheme set forth at 29 U.S.C. § 1344.

■ Under an earlier version of the statute, PBGC made distributions only of "guaranteed" or "non-forfeitable" benefits (as defined by the statute at 29 U.S.C. 1301(a)(8)). During this regime, courts permitted participants, and their unions, to bring suits against employers, as the former plan sponsors, for unfunded non-guaranteed benefits. *See Murphy v. Heppenstall Co.*, 635 F.2d 233 (3rd Cir.1980); *United Steelworkers of America v. North Bend Terminal Co.*, 752 F.2d 256 (6th Cir.1985). However, ERISA was amended [3] twice in 1986 and 1987, adding provisions which authorize the PBGC to make distributions of additional classes of benefits, 29 U.S.C. § 1322, and providing that plan sponsors are liable to the PBGC for· "the total amount of the unfunded benefit liabilities (as of the termination date) to all participants and beneficiaries under the plan." 29 U.S.C. § 1362(b)(1)(A). Part of the purpose of the ·amendments was to limit an employer's liability in order to bolster businesses where the financial burden of continued payments to a retirement plan threatened the demise of the business altogether. The rationale was that while employees· of a financially-troubled business might forfeit some promised retirement benefits, at least their continued

employment would be preserved. *See International Assn. of Machinists and Aerospace Workers v. Rome Cable Corp.*, 810 F.Supp. 402, 407 (N.D.N.Y.1993). Additionally, since the enactment of the amendments, the PBGC is required to pay not only all guaranteed benefits, but also a portion of the non-guaranteed benefits, according to a formula specified in the statute. 29 U.S.C. § 1322.

Since the amendments were enacted, courts have consistently held that, following a distress termination by the PBGC, all benefit-seeking claims against plan sponsor entities are barred, or preempted. *See. United Steelworkers of America v. United Engineering, Inc.*, 52 F.3d 1386, 1393 (6th Cir.1995); *Rome Cable Corp.*, 810 F.Supp. at 407; *Ricke v. Armco, Inc.*, 882 F.Supp. 896, 899 (D.Minn.1995) ("Under the PPA, it is fairly settled that direct participant actions for unfunded non-guaranteed benefits are no longer permissible."). The *United Steelworkers* Court explained its reasoning as follows:

First, although the plain language of the ERISA amendments does not explicitly declare whether direct suits against plan sponsors are prohibited, the language strongly implies that Congress intended the PBGC to be the sole source of recovery of payments to employees....Furthermore, ERISA now states that the PBGC is responsible for disbursing non-guaranteed benefits in accordance with a precise formula as set out in 29 U.S.C. §§ 1322(c)(2), 1322(c)(3)(A). The statute establishes a detailed priority scheme by which the PBGC allocates the nonguaranteed amounts. 29 U.S.C. § 1344(a). These detailed provisions seem to allocate all responsibility for disbursement of nonguaranteed benefits to the· PBGC,

---

**3.** Amendments comprised the Single Employer Pension Plan Amendments of 1986 ("SEPPAA"), 29 U.S.C. § 1349 (repealed 1987) and the Pension Protection Act ("PPA"), 29 U.S.C. § 1362.

strongly suggesting that suits against plan sponsors to recover those same benefits are precluded.

... As the court in *In re Adams* stated, if plan participants make claims directly against their employer, the purposes of ERISA will be defeated.

52 F.3d at 1393–94 (*citing In re Adams Hard Facing*, 129 B.R. 662 (W.D.Okla. 1991)).

### The right to arbitrate grievances

UNAP chooses not to enter into the argument concerning ERISA preemption, but instead relies on its contractual right to have disputes with Prime resolved through arbitration. This right was included in the collective bargaining agreements with both Landmark and Prime, further delineated in the October 2012 Memorandum of Agreement with Prime,[4] and explicitly reserved in the Superior Court Order authorizing the PBGC's takeover of the Retirement Plan.[5] Indeed, UNAP did everything within its power to preserve the right to arbitrate the grievance with Landmark, and then Prime, over contributions to the Retirement Plan. Nevertheless, none of these efforts is sufficient to withstand the power of ERISA's preemptive sweep.

 UNAP is also correct that "[T]he function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator." *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 567–68, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). A court's task is not to evaluate the merits of the grievance.

The processing of even frivolous claims may have therapeutic values of which those who are not a part of the plant environment may be quite unaware. Whether the moving party is right or wrong is question of contract interpretation for the arbitrator.

*Id.* at 568, 80 S.Ct. 1343. Consistent with this Supreme Court jurisprudence, UNAP argues that the dispute must go before an arbitrator, and that it is the arbitrator's role to determine if the claim is preempted by ERISA.

### Arbitrability

 While UNAP's reasoning is correct up to a point, ultimately, its argument does not control the outcome of the present dispute, because it is the role of the Court to determine *arbitrability. AT & T Tech., Inc. v. Communications Workers of America*, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). While the issue of whether or not Landmark, Prime or the Special Master made the proper contributions to the Retirement Plan may have been an arbitrable dispute at one point in the history of these various parties, it is no longer arbitrable after the take-over of the Retirement Plan by the PBGC. For the sake of argument, even if this Court were to rule that UNAP's claim is arbitrable, there is no possible relief or remedy available to UNAP because the PBGC has an exclusive claim to all unpaid contributions due to the Retirement Plan. While the Court's ruling does not squarely rest on the doctrine of mootness, the Court is nonetheless within its authority to refrain from ordering that this dispute be settled through arbitration—an order which would

---

4. As quoted previously, the Memorandum of Agreement provided that Prime would continue to process all grievances and arbitrations pending at the time of its purchase of Landmark.

5. The Superior Court order decreed "That any and all rights and remedies of UNAP with respect to the employee retirement benefits are reserved."

be meaningless because of the PBGC's exclusive claim to all monies owed to the Retirement Plan. *Church of Scientology of California v. U.S.*, 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992).

### *Conclusion*

For these reasons, Plaintiff's motion for partial summary judgment on Count I of its Petition for Declaratory Judgment is granted. Defendant's motion for partial summary judgment on Count I is hereby denied. This ruling renders the remaining counts of Plaintiff's Petition for Declaratory Judgment moot. There is no just reason to delay the entry of judgment in this case. Therefore, judgment shall enter for Plaintiff on Count I of its Petition for Declaratory Judgment, to the effect that the Court declares that all matters relating to the Retirement Plan are *not* arbitrable.

It is so ordered.